2016 IL App (1st) 151118

Nos. 1-15-1118, 1-15-2908 (cons.)

Fifth Division
September 23, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the Circuit Court |
| KIM MATSON O'MALLEY, n/k/a/ Kim Godfrey, | ) | of Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 01 D 14530 |
| | ) | |
| and | ) | The Honorable |
| | ) | Patricia Logue, |
| PAUL R. O'MALLEY, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant. | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        Petitioner Kim Godfrey filed a petition to dissolve her marriage to respondent Paul R.

O'Malley, and the trial court entered a judgment dissolving the marriage, which incorporated

a marital settlement agreement (MSA) signed by the parties. After the entry of the judgment

for dissolution of marriage, the parties continued to litigate the terms of the MSA, including

the terms related to the disposition of the former marital residence. While two appeals

concerning the MSA have been before this court, the instant appeal concerns the trial court

finding Paul in "indirect civil contempt" for failing to abide by the MSA's September 1,

2007, deadline for selling the marital residence or buying out Kim's interest in the residence

and its orders concerning the distribution of the proceeds from the sale of the residence and awarding Kim attorney fees. For the reasons set forth below, we affirm in part and vacate in part the trial court's order.

¶ 2                                    BACKGROUND

¶ 3         Kim Godfrey and Paul O'Malley were married on November 18, 1983.[1] In 2001, Kim filed a petition for dissolution of marriage, alleging irreconcilable differences as the reason for the dissolution. Kim and Paul executed a MSA on July 16, 2003, which contained, *inter alia*, a provision concerning the marital residence, a single family home located in Oak Park, Illinois. The trial court entered a judgment for dissolution of the marriage on the same day, which incorporated the MSA. The provision concerning the marital residence stated the following:

> "Paul and Kim will retain title and interest in Oak Park Marital real estate *** as tenants in common while PAUL maintains possession exclusive of KIM; PAUL will either place the Oak Park home for sale on or before September 1, 2007, or buy out Kim's interest. In the event that PAUL elects to buy out KIM's interest—or the home is listed for sale—the parties will each have the right to obtain separate SRA appraisals to determine the then current average market sale price. If the first two (2) separate appraisals are not more than $100,000 apart, either party may elect to have the first two (2) appraisers designated a 3rd SRA appraiser to submit an independent appraisal, and in that event, the current average market sale price shall be determined by averaging the two (2) highest

---

[1]As this case has come before this court on two previous appeals, we take all relevant facts from our previous decisions. *In re Marriage of O'Malley*, 2013 IL App (1st) 131641-U; *In re Marriage of O'Malley*, No. 1-10-2639 (2011) (unpublished order under Supreme Court Rule 23).

appraisals obtained. Cost of an appraisal shall be borne by the party requesting an appraisal. Kim will receive on sale or buy out by PAUL, as set forth below:

(1) If the Oak Park marital home is sold to third party(ies), KIM will receive 50% of the net sale proceeds or at least $550,000, whichever is greater, after deduction from the gross sale proceeds of any realtor or sales commission, closing costs and for $250,000 representing the mortgage and home equity debt and any credit due PAUL as stated herein. PAUL must have paid all expenses due on the property prior to sale including all payments due on mortgages, home equity loans, liens, taxes, insurance and utilities, and any such unpaid obligations will be deducted from PAUL's share of the equity realized from the sale of the residence. PAUL will receive a credit for costs paid by him, not to exceed $100,000, for special maintenance, preservation or improvement of the marital home, necessary to maintain full market value. Costs so incurred by PAUL shall require written documentation of work for costs and require pre-approval by KIM before work takes place for PAUL to obtain a credit sale at closing.

(2) If PAUL elects to buy out Kim's interest in the Oak Park marital home, Kim will receive 50% of the then current average market sale price, determined as stated in paragraph IC herein, or at least $550,000, whichever is greater, after deduction for $250,000, representing the mortgage and home equity debt and any credit due PAUL as stated herein. PAUL will receive a credit for costs paid by him, not to exceed $100,000, for special maintenance, preservation, or improvement of the marital home necessary to maintain full market value. Costs so incurred by PAUL shall require written documentation of work and costs and

require pre-approval by KIM before work takes place for PAUL to obtain a credit a buyout closing."

¶ 4 Thus, while Paul maintained exclusive possession of the marital residence, the property was owned by Paul and Kim as tenants in common until either (1) Paul bought out Kim's half of the property or (2) the property was placed for sale with Paul and Kim splitting any resulting proceeds. If the property was to be sold, the property was to be listed for sale on or before September 1, 2007.

¶ 5                           I. Kim's Petition for Rule to Show Cause

¶ 6 On November 16, 2009, prior to the May 2012 sale of the marital residence, Kim filed a "Petition for Rule to Show Cause, to Modify Judgment for Dissolution of Marriage, and other Relief." In count I of the petition, Kim alleged that after the judgment for dissolution of marriage was entered, Paul was unconcerned about the MSA's September 1, 2007, deadline for putting up the marital residence for sale and that he made no efforts to arrange for the necessary repairs that were needed prior to placing the residence on the market. Kim alleged that Paul minimally participated in the repair and renovation process. Kim alleged Paul's exclusive possession of the home and his minimal participation caused a delay in putting the marital residence on the market, which was ultimately done in 2008. Paul and Kim received an offer in August 2008 of $1.775 million, but Kim alleged that Paul felt that was a low offer and began to engage in negotiations with the prospective buyers. The final offer of $1.875 million was received on September 17, 2008, and contained an expiration time of 9 p.m. Kim alleges that she signed the contract that day and expected Paul to do so as well. Paul allegedly disregarded the 9 p.m. deadline, and the strict instructions that the final offer was not subject to a counteroffer, and submitted a counteroffer anyway. The petition alleges that

Paul and Kim's realtor for the marital residence contacted Kim to tell her that the prospective buyers had walked away from the deal because Paul submitted a counteroffer instead of a signed contract. According to the petition, the deal would have entitled Kim to a net of over $750,000 for her half of the sale. After the sale fell through, Kim allegedly had a large amount of debt that she was unable to pay due to the lost sale of the marital residence. The petition alleges that Paul's uncooperative and unmotivated behavior resulted in the failure of the completed sale on the home and that his obligations from the judgment of dissolution of marriage were clear and his failure to comply with those terms were even clearer.

¶ 7        The second count, modification of the judgment, asked the court to modify the judgment of dissolution of marriage to grant Kim exclusive possession of the residence so that Kim could attempt to maximize the profits from the sale of the residence. The petition sought the following relief:

> "(1) Enter an order requiring Respondent PAUL O'MALLEY to show cause, if any he can, for his failure to comply with the Judgment for Dissolution of Marriage; (2) find Respondent in contempt of this Court for his failure to abide by the terms of the Judgment for Dissolution of Marriage; (3) [o]rder Respondent immediately to pay Petitioner the sum of $767,500, representing Kim's share of the proceeds of the lost sale of the Residence, which sale was lost as a direct result of Respondent's contemptuous action; (4) [o]rder Respondent to be fully responsible for all improvement and maintenance cost incurred since the date the sale was to be closed, with no contribution from Kim; (5) [o]rder Respondent to tender Kim a sum equal to her additional costs incurred that are directly related to Respondent's failure to

close the sale; (6) [o]rder Respondent to pay Petitioner's attorney fees and costs associated with prosecuting this [p]etition; (7) [g]rant such other and further relief as this Court may deem just and equitable under the facts of this case; *** (8) [m]odify the Judgment for Dissolution of Marriage to terminate Respondent's exclusive possession of the [r]esidence effective immediately; (9) [m]odify the Judgment for Dissolution of Marriage to name Petitioner as sole negotiator on any contracts for the sale of the [r]esidence; (10) [a]llow Petitioner sole right to select and contract with whatever realtor she may deem appropriate; and (11) [g]rant such other and further relief as this Court may deem just and equitable under the facts and circumstances of this case."

¶ 8    On December 10, 2009, Paul responded to the petition, denying the allegation that he interfered with the sale. On January 5, 2012, the trial court found that Kim alleged a *prima facie* case of indirect civil contempt and issued an order for Paul to show cause why he should not be held in contempt of court for failing to comply with the terms of the judgment for dissolution of marriage.[2]

¶ 9    Trial on the petition was set for March 13, 2012, but ultimately did not commence until September 2013. On March 12, 2012, Paul filed a motion for summary judgment arguing that there was no evidence to support a finding that he was in contempt for noncompliance, but his motion was denied. The marital residence was ultimately sold on May 18, 2012, for $1.5 million, before the trial court could rule on Kim's petition. On May 29, 2012, the trial court ordered that " '[a]ny and all proceeds of sale of [the] former marital residence shall be held in

---

[2]During this period, an interlocutory appeal was occurring on the disqualification of Paul's attorney. *In re Marriage of O'Malley*, No. 1-10-2639 (2011) (unpublished order under Supreme Court Rule 23).

escrow,' " and Paul and Kim were ordered to execute the necessary documentation to establish that escrow account. *In re Marriage of O'Malley*, 2013 IL App (1st) 131641-U, ¶ 6. Paul filed a motion to vacate this order on June 25, 2012, arguing that it was a preliminary injunction. The trial court denied the motion on July 2, 2012, and we dismissed Paul's appeal for lack of jurisdiction. *O'Malley*, 2013 IL App (1st) 131641-U, ¶ 26.

¶ 10                                    II. Contempt Trial

¶ 11        The trial on Kim's petition for rule to show cause commenced in September 2013, and both parties called witnesses to testify on their behalf. Paul testified on his own behalf, while Kim presented the testimony of (1) Catherine Deam, Kim and Paul's real estate agent for the marital residence; (2) Robert Polachek, Paul's previous attorney; (3) Barbara Binik, the 2008 prospective buyers' realtor; and (4) herself. Since Paul does not challenge the trial court's findings of fact, we relate here only the facts needed to understand the issues on appeal.

¶ 12        Deam testified[3] that she was chosen as Paul and Kim's realtor to sell the marital residence, which was placed on the market later than the September 1, 2007, date specified in the MSA due to the staging of the marital residence, maintenance completed on the property, and the selection process of choosing a realtor that Paul and Kim both agreed upon; Deam explained that the marital residence was considered a historic home, as it was built by the architects Tallmadge and Watson, and she had experience in selling historic homes similar to the marital residence. The residence was eventually placed on the market in April 2008 for $2.3 million, and Deam received an offer from prospective buyers for $1.775 million.

¶ 13        Robert Polachek testified that after Paul received the offer from the prospective buyers, Paul asked Polachek to seek a modification of the final offer with respect to the closing date

---

[3]Deam provided an evidence deposition on May 2, 2012, and her deposition was used in lieu of live testimony.

and radon mitigation costs. Polachek testified that an e-mail with a counteroffer regarding the closing date and the radon costs was sent at 6:39 p.m. on September 17, 2008. Polachek also testified that the prospective buyers did not respond and the sale was subsequently terminated.

¶ 14     Barbara Binik, the prospective buyers' realtor, testified that on September 17, 2008, around 12:48 p.m., she sent Deam a fax on behalf of her clients with a new offer. She additionally testified that this new offer was to be terminated at 9 p.m. that evening.

¶ 15     At trial, Kim testified that she and Paul agreed to use Deam as their realtor because she and Paul felt that the property's historic status required a certain level of experience and they believed Deam was qualified to sell the marital residence. Kim testified that on August 11, 2008, Kim and Paul received an offer on the property, and that through a series of negotiations, both parties agreed upon a price of $1.875 million for the marital property. The prospective buyers imposed a 9 p.m. deadline on their final offer. Kim testified that she signed the final offer prior to this deadline, but Paul did not. Kim testified that she became aware of the incomplete sale on September 22, 2008.

¶ 16     Prior to the prospective buyers' final offer, Paul testified that he had the financial ability to buy out Kim's interest in the marital residence but chose not to buy out her interest because it was not in his financial best interest to do so. In regards to the prospective buyers' final offer, Paul testified at trial that he told his attorney to e-mail the prospective buyers and seek a modification on the final offer. Paul testified that after the prospective buyers' final offer terminated, the price of the marital residence was reduced over the years, and the final asking price was reduced to $1.59 million in 2012. The property sold in May 2012 for $1.5 million.

¶ 17                                   III. Contempt Order

¶ 18          On April 2, 2014, the trial court found Paul to be in "indirect civil contempt" and ordered

Paul to pay an amount equal to half of the 2008 final offer of $1.875 million. Additionally,

the trial court found Kim, Polachek, and Binik to be credible witnesses and Paul to be an

incredible witness. The trial court ordered the following:

> "(A) [t]he court has jurisdiction over the parties and the subject matter; (B)
>
> [t]he petition for Rule to Show Cause is granted. Paul failed to show cause for his
>
> failure to comply with the MSA and JDOM property provisions; (C) Paul R.
>
> O'Malley is held in indirect civil contempt of court for his willful and
>
> contumacious failures to abide by the parties' MSA and JDOM as set forth above,
>
> including failing to comply with the September 1, 2007, MSA deadline and
>
> related obligations; recklessly destroying the September 17, 2008, contract
>
> opportunity for Kim without good cause; and failing repeatedly to deal fairly and
>
> in good faith with Kim and her contractual interests; (D) Paul breached his
>
> contract with Kim under the MSA by these same actions, causing her economic
>
> losses and other harms; (E) Paul shall pay Kim; 1) $153,473.30, representing the
>
> remaining principal due owing from the MSA distribution formula, after paying
>
> from Paul to Kim [the amount] of $157,000 from the escrow account; 2)
>
> $120,115.90 on prejudgment interest on the full principal amount of $310,473.30
>
> at 5% per annum simple interest for the period from September 1, 2007, through
>
> entry of the court's judgment as an equitable remedy for the delays, expenses and
>
> other harms Paul caused to Kim during this period; 3) $14,487.65 for
>
> reimbursement of real estate taxes charged to Kim; and 4) 9% interest per annum

on all amounts due and owing upon this judgment, until fully paid per 735 ILCS 5/2-1303; (F) [a]ll remaining funds in the escrow fund will be distributed to Kim with Paul receiving credits, as described above; (G) Kim's motion to strike Paul's affirmative defense of laches as to Count I of the Petition is granted; (H) Paul's motion to dismiss Count II of Kim's Petition of alleged lack of citation to legal authority is denied; [I] [t]he court incorporates by reference its prior rulings in this case, including rulings on dispositive motions; (J) [t]he parties may file any petitions for fees costs, and/or contribut[ions] arising under a statute and/or the MSA within 35 days of this order; and (K) [t]he court retains jurisdiction to enforce the terms of this order."

¶ 19                                    IV. Posttrial Motions

¶ 20        Paul filed his posttrial motion to vacate the court's order on April 29, 2014. The posttrial motion was denied on March 18, 2015. On April 17, 2015, Paul filed his notice of appeal based on the contempt findings and the amount of proceeds awarded to Kim that were based upon the 2008 final offer price. On September 17, 2015, the trial court awarded Kim $64,229.43 for attorney fees and costs. On October 13, 2015, Paul filed a notice of appeal on the trial court's finding that Kim was entitled to recover for attorney fees and costs. Both appeals, regarding the contempt finding and the amount awarded to Kim including attorney fees, were consolidated on November 5, 2015.

¶ 21                                        ANALYSIS

¶ 22        On appeal, Paul argues that (1) Paul was actually held in indirect criminal contempt, not indirect civil contempt, which violated his constitutional rights; (2) the trial court's damages award for breach of "the implied covenant of good faith and fair dealing" was invalid; (3) the

10

trial court did not have the authority to modify the terms of the property provisions of the parties' MSA; (4) the trial court did not have the authority to award prejudgment interest as a remedy for contempt; (5) the petition for rule to show cause failed to state a cause of action and his motion to dismiss should have been granted; and (6) Kim was not entitled to attorney fees based off a fee-shifting provision in the MSA. We consider each argument in turn.

¶ 23                                              I. Contempt

¶ 24        Paul first argues that he was held in indirect criminal contempt in violation of his constitutional rights. Paul claims that the trial court's contempt finding was actually criminal in nature because the requirements under the MSA no longer existed. By contrast, Kim contends that Paul was properly found to be in indirect civil contempt, as Paul was not punished by the court but coerced into complying with the MSA. The trial provided the following reasons as its basis for the indirect civil contempt finding:

> "Paul *** is held in indirect civil contempt *** for his willful and contumacious failure to abide by the parties' MSA and JDOM as set forth above, including failing to comply with the September 1, 2007, deadline and related obligations; recklessly destroying the September 17, 2008, contract opportunity for Kim without good cause; and failing repeatedly to deal fairly and in good faith with Kim and her contractual interests."

¶ 25        When a contempt appeal is filed, the standard of review is an abuse of discretion. *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 785 (2009). A trial court abuses its discretion only when " 'no reasonable person would take the view adopted by the trial court.' " (Internal quotation marks omitted.) *Willbourn v. Cavalenes*, 398 Ill. App. 3d 837, 848 (2010) (quoting *Foley v. Fletcher*, 361 Ill. App. 3d 39,

11

46 (2005)). "Whether a contempt finding should be vacated is a question to be determined on the individual facts of the particular appeal." *Dole v. Township High School District 211*, 2015 IL App (1st) 140857, ¶ 121 (citing *Consolidation Coal v. Bucyrus-Eire Co.*, 89 Ill. 2d 103, 122 (1982)).

¶ 26    In order to determine whether a contempt finding is civil or criminal in nature, it is important to consider " 'the purpose for which the contempt sanctions are imposed.' " *Emery v. Northeast Illinois Regional Transportation Co.*, 374 Ill. App. 3d 974, 977 (2007) (quoting *In re Marriage of Sharp*, 369 Ill App. 3d 271, 278 (2006)). Civil contempt is " 'designed to compel future compliance with a court order' " and is " 'avoidable through obedience.' " *Emery*, 374 Ill. App. 3d at 977 (quoting *Sharp*, 369 Ill. App. 3d at 279). A person held in civil contempt must have the ability to purge the contempt by complying with the court order. *Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 633 (1991). Contempt based on past actions which cannot be undone means that the contemnor lacks the ability to purge the contempt (see *Luttrell v. Panozzo*, 252 Ill. App. 3d 597, 602 (1993)) because the purpose of civil contempt is to compel compliance with court orders, not to punish (*County of Cook v. Lloyd A. Fry Roofing Co.*, 59 Ill. 2d 131, 135 (1974)). Therefore, whenever a court order cannot be complied with, there cannot be a finding of civil contempt. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 46 (1990).

¶ 27    By contrast, criminal contempt is " 'instituted to punish, as opposed to coerce, *** for past contumacious conduct.' " *Emery*, 374 Ill. App. 3d at 977 (quoting *Sharp*, 369 Ill. App. 3d at 279). Criminal sanctions are retrospective in that " 'they seek to punish a contemnor for past acts [that] he cannot now undo.' " *Emery*, 374 Ill. App. 3d at 977 (quoting *Betts*, 200 Ill. App. 3d at 46). " '[I]ndirect civil contempt is a continuation of the original cause of action,' "

while criminal contempt proceedings are separate and distinct and not part of the original case being tried. *Levaccare v. Levaccare*, 376 Ill. App. 3d 503, 509 (2007) (quoting *People v. Budzynski*, 333 Ill. App. 3d 433, 438 (2002)). In short, criminal contempt consists of punishing for doing what has been prohibited or not doing what has been ordered, while civil contempt is invoked to coerce what has been ordered (*Budzynski*, 333 Ill. App. 3d at 438), and once the contemnor complies, no further civil sanctions are imposed (*Betts*, 200 Ill. App. 3d at 44). In sum, the attributes of civil contempt are that (1) the contemnor is able to perform the action demanded by the court and (2) no further civil sanctions are imposed if the contemnor complies. *Betts*, 200 Ill. App. 3d at 44.

¶ 28    In the case at bar, Paul contends that the trial court's finding of civil contempt was actually indirect criminal contempt, and thus his constitutional rights were violated. Kim argues that the trial court properly found Paul to be in civil contempt and that the court merely ordered him to comply with his obligations set forth in the judgment for dissolution of marriage.[4] The trial court's April 2, 2012, order found Paul to be in "indirect civil contempt" for the following reasons: (1) his failure to abide by the September 1, 2007, deadline for selling the marital residence; (2) lying about his capacity to buy out Kim's share of the property; and (3) "killing" the 2008 sale without consulting Kim. The trial court found Paul to be an incredible witness, and as the trial court is the finder of fact and in the best position to observe the conduct and determine the credibility of the witnesses, we give the trial court deference and apply the manifest weight of the evidence standard of review upon our review of any factual findings. See *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). While

---

[4]The parties do not dispute that the contempt was indirect, since it did not occur in the trial court's presence. See *Levaccare*, 376 Ill. App. 3d at 509; *Budzynski*, 333 Ill. App. 3d at 436 (discussing how the petitioner in *Levaccare* filed a petition for adjudication of indirect civil contempt, as the respondent failed to comply with the court's order).

the trial court labeled the contempt as civil in nature, the substance of the contempt finding, not the label given, is what will determine whether the contempt finding was criminal or civil in nature. *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 15 (the appellate court is not bound to the trial court's designation of civil or criminal contempt, but instead will examine the nature of the sanctions imposed).

¶ 29       Once the sale was complete, Paul could not comply with MSA or any court orders requiring him to comply. As a result, the trial court's order actually found him to be in criminal contempt, not civil contempt. The fundamental nature of civil contempt is to coerce an individual to comply with a court order by giving that individual the opportunity to purge himself of contempt through compliance. *Pancotto v. Mayes*, 304 Ill. App. 3d 108, 111 (1999). In the case at bar, the trial court based its finding of civil contempt upon the condition it would afford Paul the opportunity to purge himself of the contempt charge "[u]pon Kim's receipt of all escrowed funds allocated to her under this order." However, a finding of civil contempt is not proper unless the ability to purge a contempt finding is within the power of the contemnor. *In re Marriage of Berto*, 344 Ill. App. 3d 705, 713 (2003).

¶ 30       For instance, in *Berto*, the appellate court found that once the respondent paid the unallocated maintenance and child support that was owed to the petitioner, he no longer had the ability to " 'purge' " himself of the alleged contempt, and thus, there remained no basis for a finding of civil contempt. *Berto*, 344 Ill. App. 3d at 713. In the case at bar, the marital residence was sold on July 16, 2012, which meant Paul did not have the ability to comply with the order at the time of the contempt hearing because he could not have put the marital residence up for sale or bought out Kim's share of the home because it had been sold to another person. A finding of civil contempt would only have been proper if Paul had the

ability to place the home on the market or buy out Kim's share. However, since the sale of the home was completed, Paul was unable to buy out Kim's share of the home. The purge provision of the trial court's order could not provide Paul with the opportunity to comply with the MSA because that opportunity did not exist once the home was sold. As a result, the contempt finding can only be determined to be criminal in nature because it was punishing Paul for his past conduct.

¶ 31    A person charged with criminal contempt is entitled to similar constitutional protections and procedural rights that a criminal defendant is afforded. *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 27. For instance, in *Weddigen*, the appellate court found that the respondent was not afforded many of the constitutional and procedural rights he should have been afforded when the indirect civil proceedings transformed into indirect criminal contempt proceedings. *Weddigen*, 2015 IL App (4th) 150044, ¶ 28. Even though the contempt proceedings in *Weddigen* appeared to be both civil and criminal in nature, the court found that once the original petition, which sought civil contempt, transitioned to be criminal in nature, certain constitutional and procedural protections were required. *Weddigen*, 2015 IL App (4th) 150044, ¶¶ 26, 28. A failure to provide constitutional and procedural guarantees results in vacatur of the contempt finding. *Luttrell*, 252 Ill. App. 3d at 601. The constitutional protections that are allowed for all criminal defendants are (1) right to jury trial when incarceration exceeds six months or the fine exceeds $500; (2) right to counsel; (3) right to change of judge; (4) right to be charged with a written complaint, petition, or information; (5) right to personal service and to know the nature of the charges; (6) right to file an answer and a have public trial; (7) right to present evidence, subpoena witnesses, and to confront and cross-examine witnesses; (8) right to the presumption of innocence and against self-

incrimination; and (9) right to be proven guilty beyond a reasonable doubt. *Budzynski*, 333 Ill. App. 3d at 439. In addition, the trial court must admonish defendant of his constitutional rights.

¶ 32 In the case at bar, Paul was not notified of a criminal contempt proceeding, was not admonished as to his rights, nor found guilty beyond a reasonable doubt for a criminal contempt charge. Thus, Paul was not afforded his constitutional rights when found to be in contempt that was criminal in nature. As a result, the contempt finding is vacated.

¶ 33                 II. Breach of Contract and Remedy Awards

¶ 34 Next, Paul argues on appeal that the trial court's award for breach of "the implied covenant of good faith and fair dealing" was improper because using the implied covenant of good faith and fair dealing as the sole basis for a breach of contract finding is improper. In the case at bar, the trial court based its breach of contract finding on Paul's failure to abide by the parties' MSA and judgment for dissolution of marriage, which included Paul failing to comply with the September 1, 2007, deadline and related obligations, recklessly destroying the 2008 contract opportunity, and failing to repeatedly deal in good faith with Kim. However, the trial court indicated that breach of contract was an alternative basis to its contempt findings by stating, "Should the contempt finding or remedy be invalidated for any reason, in whole or in part, the parallel contract remedy shall apply instead as to any invalid portions." As we find the contempt finding to be improper, it is therefore necessary to consider whether the alternative contract remedy was legally proper.

¶ 35 Paul bases his argument on the allegation that Kim's petition did not state a claim for breach of contract or upon a breach of the implied covenant of good faith and fair dealing. As a result, Paul argues that Kim is unable to recover from a cause of action that was not

pleaded in her pleadings. Paul contends that this finding should also be vacated so that Paul can demand a jury trial and provide a proper defense. Kim argues that the trial court merely provided an alternative basis to find that Paul violated the MSA.

¶ 36       A trial court can determine whether a party to a MSA violated the agreement between the parties. See *In re Marriage of Lyman*, 2015 IL App (1st) 132832. Judges in the domestic relations division make these decisions almost on a daily basis.

¶ 37       In the case at bar, the trial court found that "Paul breached his contract with Kim under the MSA *** causing her economic losses and other harms." The trial court found that Paul's conduct in not notifying, discussing, or obtaining Kim's approval to counteroffer or to buy her out was a willful and contumacious failure to abide by the parties' MSA. The trial court found that Paul recklessly destroyed the September 17, 2008, offer to purchase and repeatedly failed to deal with Kim fairly and in good faith.

¶ 38       Paul correctly states that in Illinois, the implied covenant of good faith and fair dealing is "not an independent source of duties for the parties to a contract." *Fox v. Heimann*, 375 Ill. App. 3d 35, 42 (2007). However, although the implied covenant of good faith and fair dealing is included among the reasons by the trial court as to why Paul was found to be in breach of the MSA, it is not the sole basis the trial court used to find that Paul breached the contract. Thus, we review the question of the trial court's finding that Paul breached the MSA in light of all of the trial court's stated reasons, not just the implied covenant of good faith and fair dealing.

¶ 39       The express terms of the MSA stated that Paul was required to either put the marital residence up for sale on or before September 1, 2007, or buy out Kim's interest. The home was not up for sale by the expressed deadline, and Paul did not buy out Kim's interest.

Furthermore, the trial court found that Paul failed to provide a credible reason as to why he failed to comply with the September 1, 2007, deadline. Paul also testified that he had the ability to buy out Kim's share of the property, but chose not to do so, thus testifying that he chose not to comply with the contract. Thus, we affirm the trial court's finding of Paul to be in breach of the MSA.

¶ 40                    III. Trial Court Authority to Modify the MSA

¶ 41        Next, Paul argues that the trial court did not have authority to modify the terms of the property provisions of the parties' MSA. Paul seeks a remand for redistribution of the sale proceeds in accordance with the unmodified provisions of the MSA. Kim contends that the court had the inherent power to enforce its judgments, and that the terms of the MSA are enforceable by all remedies available. Additionally, Kim argues that the trial court merely modified the valuation provisions of the marital residence. In the case at bar, the trial court determined that the property distribution formula, which establishes the amount Kim is entitled to, should be calculated based upon the offer for the purchase of the marital home tendered to Paul and Kim in 2008. We agree with Kim that the trial court did not modify the terms of the MSA, but rather enforced the terms of the MSA.

¶ 42        The trial court's jurisdiction over a modification to the parties' MSA is a question of law and thus subject to *de novo* review. *In re Marriage of Hall*, 404 Ill. App. 3d 160, 164 (2010); *In re Marriage of Allen*, 343 Ill. App. 3d 410, 412 (2003). *De novo* review means the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). A trial court may not revoke or modify property dispositions " 'unless the court finds the existence of [a condition] that justif[ies] the reopening of a judgment under the laws of this State.' " *Hall*, 404 Ill. App. 3d at 164 (quoting

18

750 ILCS 5/510(b) (West 2008)). After a 30-day period,[5] property provisions in a MSA are not modifiable, but a trial court has jurisdiction to modify property distribution if circumstances exist that give cause to reopen a judgment as in other civil cases. *Hall*, 404 Ill. App. 3d at 164; *In re Marriage of Hubbard*, 215 Ill. App. 3d 113, 116 (1991). A reopening of a judgment is deemed proper if the MSA execution had some element of fraud, coercion, or misrepresentation. *In re Marriage of Munford*, 173 Ill. App. 3d 576, 579 (1988); *Thompson v. Thompson*, 91 Ill. App. 3d 943, 945 (1980). However, a trial court has indefinite jurisdiction to enforce the terms of a judgment that included a MSA and that is what the trial court did here. *Hall*, 404 Ill. App. 3d at 164.

¶ 43    In *Hall*, the petitioner and respondent's judgment for dissolution of marriage incorporated a MSA entered into by the parties, which contained two provisions concerning the division of the respondent's retirement plans. *Hall*, 404 Ill. App. 3d at 162-63. One provision provided that the parties would enter into a qualified domestic relations order (QDRO) providing for the distribution of 50% of the account balance of two specified retirement plans to the petitioner. *Hall*, 404 Ill. App. 3d at 162-63. The second provision provided that " '[i]t is the intention of this [article] that [petitioner] is to receive fifty percent (50%) of the account balance of each of [respondent's] retirement plans valued as of the date of the entry of this [judgment for dissolution of marriage].' " *Hall*, 404 Ill. App. 3d at 163. After the division of assets, the petitioner noticed that she had not received benefits from two additional pension plans belonging to the respondent and filed a petition to modify or reform the dissolution judgment, alleging that the pension plans had been omitted from the MSA due to a mutual

---

[5]Pursuant to the Code of Civil Procedure, any party, within 30 days after the entry of the judgment, may file a motion for a rehearing, retrial, or modification of the judgment. 735 ILCS 5/2-1203 (West 2014).

mistake of fact. *Hall*, 404 Ill. App. 3d at 163. The trial court found that it did not have jurisdiction to modify or reform the judgment because the petitioner did not first establish a basis to vacate the judgment as a result of duress, disability, or fraudulent concealment. *Hall*, 404 Ill. App. 3d at 163.

¶ 44    On appeal, the *Hall* court found that the trial court had jurisdiction to enforce the MSA without first establishing a basis to vacate the dissolution judgment because "petitioner is not seeking to impose new or different obligations on the parties. Rather she is attempting to enforce the parties' rights and obligations with respect to respondent's retirement plans, which were clearly laid out in the marital settlement agreement and judgment of dissolution." *Hall*, 404 Ill. App. 3d at 165. Accordingly, the court proceeded to interpret the language of the agreement to determine if the parties had intended to include all four retirement plans or only the two specified in the agreement. *Hall*, 404 Ill. App. 3d at 167.

¶ 45    We find the *Hall* court's analysis instructive. See *Hall*, 404 Ill. App. 3d at 161. In the case at bar, the trial court was enforcing Paul and Kim's MSA by using the valuation of the sale that should have been completed, but was not, due to Paul's conduct in breaching the MSA. The trial court did not modify the MSA, but rather enforced the terms of the MSA that required Paul to pay Kim a specified amount. The amount Paul was to pay was based on a distribution formula that was based upon the marital home being sold to a third party in which Kim would receive 50% of the net sales proceeds or at least $550,000, whichever was greater.

¶ 46    Paul cites *In re Marriage of Clark*, 149 Ill. App. 3d 613, 617 (1986), and *In re Marriage of Hubbard*, 215 Ill. App. 3d at 117, to illustrate how a trial court lacks subject matter jurisdiction to modify the judgment for dissolution of marriage, specifically with respect to

the parties' marital residence. In *Clark*, the defendant filed a petition to modify the property division of the parties' MSA to transfer possession of the marital residence to him and to execute a quitclaim deed in his favor. *In re Marriage of Clark*, 149 Ill. App. 3d at 614. The reviewing court affirmed the trial court's determination to deny the defendant's petition, as requiring the plaintiff to convey her interest to the defendant through a quitclaim deed required the court to modify the judgment. *In re Marriage of Clark*, 149 Ill. App. 3d at 618. Paul's use of *Clark* is not instructive to this court, as the parties in *Clark* were required to comply with an additional obligation, while Kim's petition merely seeks enforcement of the existing MSA. *In re Marriage of Clark*, 149 Ill. App. 3d at 617.

¶ 47    In *Hubbard*, the reviewing court was to determine whether the trial court's award for expenses incurred during the preparation for placing the marital residence on the market was beyond its jurisdiction. *Hubbard*, 215 Ill. App. 3d at 114. The *Hubbard* court found that apportionment of expenses that were not expressly stated in the MSA could not be enforced by the trial court, regardless of equitable and reasonable circumstances to enforce the apportionment. *Hubbard*, 215 Ill. App. 3d at 118. Like *Clark*, *Hubbard* does not provide this court with any guidance as that case involved a dispute over repair and maintenance requests and the trial court's order requiring the respondent to pay for a portion of the repairs not covered under the MSA, while the case at bar only required Paul to comply with the MSA and did not impose any additional obligations or costs on Paul. *Hubbard*, 215 Ill. App. 3d at 114. While both cases show that the trial court does not have jurisdiction to modify a MSA under these specific circumstances, the trial court in the case at bar was merely enforcing the terms and provisions that Paul and Kim agreed upon.

¶ 48    In the case at bar, the trial court was enforcing, not modifying, the MSA by using the

valuation of the sale that should have been completed, but was not, due to Paul's conduct. The trial court found that Paul's conduct was the reason that the 2008 offer was not accepted, and based its award upon the 2008 lost sale. The trial court's order, based upon Paul's conduct, actually enforced the MSA and did not modify it. Thus, we affirm the trial court's use of the lost 2008 sale price in the MSA distribution formula.

¶ 49                                    IV. Prejudgment Interest Award

¶ 50        Paul next contends that the trial court lacked authority to award prejudgment interest to Kim. The trial court found that a prejudgment interest award was warranted due to Paul's failing to comply with the MSA's September 1, 2007, deadline, recklessly destroying a contract opportunity without good cause, failing repeatedly to deal fairly and in good faith with Kim, and breaching the MSA. Paul argues that Kim does not have the right to recover prejudgment interest. Thus, Paul argues that the award must be reversed. Kim argues that the trial court was well within its discretion when awarding prejudgment interest, as this award was not compensatory in nature. The trial court here awarded Kim prejudgment interest for Paul's failure to place the house on the market by the deadline or buy Kim's shares as an equitable remedy for the long delays and significant expense caused by Paul's conduct.

¶ 51        A determination to award prejudgment interest is within the trial court's discretion, and such a determination will not be disturbed unless an abuse of discretion is present. *Lyon Metal Products, L.L.C. v. Protection Mutual Insurance Co.*, 321 Ill. App. 3d 330, 348 (2001). An abuse of discretion is present when " 'no [other] reasonable person would agree with the position adopted by the trial court.' " *Tully v. McLean*, 409 Ill. App. 3d 659, 672 (2011) (quoting *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997)). Prejudgment interest is proper when it is authorized by a statute, authorized by agreement of the parties, or warranted by

equitable considerations. *Tully*, 409 Ill. App. 3d at 684-85. In terms of equitable considerations, the determination of whether equity supports an award of interest lies within the discretion of the trial court, and we will not disturb a determination that it exists unless the trial court abused its discretion. *Tully*, 409 Ill App. 3d at 685; *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989).

¶ 52       When equitable considerations warrant prejudgment interest, the award must not conflict with justice and equity. *In re Estate of Wernick*, 127 Ill. 2d at 87. However, prejudgment interest may not be awarded when the defendant provides a good faith justification for failure to provide payments upon which the plaintiff seeks prejudgment interest. *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1127 (2008) (the court determined that the husband's good faith justification for not sharing his disability payments did not warrant prejudgment interest). Likewise, prejudgment interest awards are improper if the court fails to set forth any equitable considerations as a basis for a prejudgment interest award. *In re Marriage of Blinderman*, 283 Ill. App. 3d 26, 34 (1996). In the case at bar, the trial court's determination to award prejudgment interest was proper because equitable considerations were present and Paul created an unreasonable delay in the selling of the marital residence, thus not only delaying the payment to Kim but causing her to receive less than the offer Kim agreed to receive. Additionally, Paul failed to provide a good faith justification for failing to comply with the MSA, as he explicitly admitted that he had the ability to comply but chose not to. The trial court cited Paul's delays, expenses, and other harms as a basis to award prejudgment interest to Kim. The original petition requested Kim's bargained-for interest in the sale of the home and for any additional relief the trial court found to be just and equitable under the circumstances. We find that the award of prejudgment interest to Kim was within

the authority of the trial court to award a prejudgment interest, with a proper basis to establish a prejudgment interest award.

¶ 53        The trial court awarded Kim prejudgment interest at 5% per annum on the $310,473.30 owed from Paul to Kim for the period from September 1, 2007, when Paul failed to place the house on the market or buy out Kim, to March 31, 2014, as an equitable remedy for the long delays caused by Paul's conduct. The trial court calculated the prejudgment interest as starting from September 1, 2007, the date that the marital residence was to be on the market, through the date that the trial court entered its order. Paul's intentional interference provides a basis for a prejudgment interest because his conduct resulted in an unreasonable delay of the sale of the home and caused Kim to receive less for her portion of the sale. Likewise, the formula based the 5% per annum interest on the amount of $310,473.30, which is the additional amount owed to Kim in order to provide her 50% of the net proceeds from the sale of the residence, as set forth in the MSA.[6] This formula amounted to $102,115.90 in prejudgment interest. The amount awarded does not appear to be irrational or inequitable, as it is interest provided to Kim for time delay that Paul caused. Thus, we affirm the trial court's finding of prejudgment interest in the amount of 5% per annum on the $310,473.30, equaling $102,115.90 from Paul to Kim.

¶ 54                    V. Petition for Rule to Show Cause and Cause of Action

¶ 55        Paul originally filed a motion to dismiss, pursuant to section 2-615 of the Code of Civil Procedure, on March 26, 2013, and the trial court denied that motion to dismiss on the same

---

[6]The trial court's order used the 2008 final offer in the distribution formula to determine the amount owed to Kim. This formulation gives Kim $761,875, as Kim was entitled to either 50% of the net proceeds or $550,000, whichever was greater, under the terms of the MSA. Kim had already received $451,401.70 from an earlier distribution of escrowed funds. Thus, Kim was entitled to $310,473.30 from Paul in order to be compliant with the MSA.

day. 735 ILCS 5/2-615 (West 2012). Paul's argument, that the petition for rule to show cause failed to state a cause of action, is based upon the proposition that a civil contempt proceeding cannot award compensatory damages and because the awards to Kim were compensatory in nature the petition failed to state a cause of action. Due to the failure to state a cause of action, Paul contends that dismissal of the petition is proper. See *In re Marriage of Blankshain*, 346 Ill. App. 3d 750, 752-53 (2004). Kim argues that even though her petition sought monies that could be considered compensatory in nature, Kim was also seeking the enforcement of the judgment for dissolution of marriage. Her petition, as Kim contends, did not only seek monies that could appear to be compensatory, but rather a multitude of requests including damages as a result of Paul's conduct in breaching the MSA.

¶ 56    Paul is correct that a civil contempt order cannot award compensatory damages. However, the trial court used an alternative theory concerning the breach of the MSA and we affirm on that basis, as we may affirm on any basis found in the record. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010) (a reviewing court may affirm on any basis found in the record).

¶ 57    The trial court awarded Kim (1) the remaining principal due to her based upon the MSA distribution formula; (2) prejudgment interest, based upon the period of time from when the home was ordered to be on the market; (3) real estate taxes charged to Kim; and (4) attorney fees and costs based upon a fee-shifting provision in the MSA. The trial court found that Paul intentionally interfered with the sale of the home and intentionally disregarded the terms of the MSA. The award to Kim based upon the remaining principal owed to Kim was the result of the trial court awarding Kim her rights under the MSA, as we concluded in the breach of contract section of our analysis. Similarly, as we have discussed, the trial court has authority to award prejudgment interest when certain conditions are met and, as the trial court properly

found, equitable considerations were present here that justify the trial court awarding Kim prejudgment interest. Additionally, the trial court found that Paul intentionally interfered with the sale of the home, and the unreasonable delay in the sale of the home further justifies that award. Neither party contests Kim's award for real estate taxes charged to her, and in turn it will not be addressed. Finally, a contract that includes a fee-shifting provision will generally be enforced by the courts, and we enforce the attorney fees as we discuss below. Each award that was given to Kim was properly awarded to her, as damages are proper in a breach of contract action. See *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 89 (" '[A]ll damages which naturally and generally result from a breach [of contract] are recoverable.' "(quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 318 (1987))). Thus, we affirm the trial court's dismissal of Paul's motion to dismiss for failure to state a cause of action.

¶ 58                                 IV. Contribution of Attorney Fees and Costs

¶ 59        Finally, Paul argues that the award of attorney fees and costs, based upon the fee-shifting provision in the MSA, should be reversed because contractual fee-shifting provisions should only be rewarded to a prevailing party. Paul contends that the "American Rule," in which litigants are required to pay their own attorney fees, should be applied to the case at bar. Citing to *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 516 (2001), Paul attempts to argue that the trial court did not compel him to perform some type of act, and thus the fee-shifting provision cannot be acted upon.[7] Additionally, Paul argues that the

---

[7]We find Paul's use of *Powers* unpersuasive, as Kim was the prevailing party in the trial court's order. In *Powers*, the attorney fees provision did not apply because the trial court held that the matter of property damages was independent of the lease between both parties. *Powers*, 252 Ill. App. 3d at 517. Additionally, the appellate court determined that because the defendant prevailed on a majority of the issues before the trial court and the plaintiff prevailed on only

enactment of the MSA's fee-shifting provision requires two conditions to occur: (1) there is an enforcement of a condition and (2) the condition enforced is found within the terms and provisions of this agreement. Thus, Paul contends that because neither prerequisite is satisfied in the case at bar, Kim should not be able to recover attorney fees and costs. Kim argues that the award of attorney fees and costs was proper and will not be disturbed unless there is an abuse of discretion. See *In re Marriage of Powers*, 252 Ill. App. 3d 506, 508-09 (1993). The MSA states the following:

> "If Paul fails to perform his financial and other undertakings, and as a result Kim incurs any expenses including legal fees to enforce the terms and provisions of the agreement, Paul shall indemnify her against and hold her harmless in connection with any such expenses even [though] Kim at the time, may have the ability to pay her own such expenses."

¶ 60      The standard of review for a trial court's determination of awarding attorney fees and costs is an abuse of discretion. *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 245 (2010). " '[W]hether and in what amount to award attorney fees is within the discretion of the trial court, and the decision will not be disturbed on appeal absent an abuse of that discretion.' " *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 245 (quoting *R.J. Management Co. v. SRLB Development Corp.*, 346 Ill. App. 3d 957, 971 (2004)). An abuse of discretion occurs when the ruling is "arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815 (2008).

---

issues related to property damage, the trial court abused its discretion, as the plaintiff was not the prevailing party in the matter, which means the trial court should not have awarded attorney fees. *Powers*, 252 Ill. App. 3d at 518.

¶ 61        Ordinarily, a losing party in a lawsuit cannot be required to pay attorney fees to the winning party, but if there is a contractual "fee-shifting" provision for the award of attorney fees, it will be enforced by the courts. *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 254. If a fee-shifting provision for attorney fees is present in a contractual obligation, we are required to strictly construe the provision. *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 254.

¶ 62        Kim was awarded $64,229.43 for attorney fees and costs, based upon the fee-shifting provision in the MSA. As the fee-shifting provision states, Paul was required to indemnify Kim for any expenses, including legal fees, that were a result of her attempting to enforce the terms and provisions of the MSA. The trial court determined that the $64,229.43 was the correct amount to award Kim for her attorney fees and costs, as Paul was found to be in breach of contract for failing to abide by the provisions of the MSA. Due to the extensive litigation history surrounding the case at bar, combined with the trial court's findings of Paul interfering and intentionally ignoring the MSA, the trial court did not abuse its discretion when awarding attorney fees. Eight years have passed since the original petition for rule to show cause was filed, and four years since the home has been sold. Paul's appeals on the MSA resulted in an extensive delay in the trial on Kim's petition for rule to show cause. Likewise, it was Paul's conduct that resulted in the lost 2008 sale and the breached contract. Paul's conduct has resulted in Kim incurring large amounts of attorney fees. Thus, we affirm the trial court's order awarding attorney fees and costs to Kim.

¶ 63                                    CONCLUSION

¶ 64        For the foregoing reasons, we affirm in part and vacate in part the order of the circuit court of Cook County. We find that the trial court abused its discretion when finding Paul to

be in indirect civil contempt and vacate the contempt finding but affirm its alternative finding of breach of the MSA and the award of damages. We cannot say that the trial court abused its discretion when it awarded prejudgment interest to Kim or when it awarded Kim attorney fees and costs. Further, we find that the trial court was not modifying the terms of the MSA, but merely enforcing the terms of the MSA, when it calculated the amount due to Kim by using the 2008 contract price instead of the 2012 price.

¶ 65  Affirmed in part and vacated in part.