2020 IL App (1st) 182501-U

FIRST DIVISION
December 7, 2020

No. 1-18-2501

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF:<br>MARK T. ULANOV,<br><br>    Petitioner-Appellee/Cross-Appellant,<br><br>v.<br><br>IRENE ULANOV,<br><br>    Respondent-Appellant/Cross-Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>Cook County<br><br>No. 96 D 2992<br><br>The Honorable<br>Mark Lopez,<br>Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The judgment of the circuit court is affirmed in part and reversed in part and we remand for further proceedings. The circuit court did not err by (1) enforcing petitioner's obligation to maintain a life insurance policy by ordering petitioner to self-insure, (2) rejecting petitioner's impossibility defense, and (3) denying respondent's petition for attorney fees under Rule 137. We reverse the circuit court's denial of respondent's petition for attorney fees under section 508 because the circuit court applied the wrong standard, and we remand for further proceedings on respondent's fee petition.

¶ 2   Petitioner, Mark T. Ulanov, and respondent, Irene Ulanov, cross-appeal from the circuit court's judgment entered in a postdissolution of marriage proceeding. Irene filed a petition against

Mark for indirect civil contempt and for other relief, alleging in relevant part that he failed to maintain a $250,000 life insurance policy and provide her with proof of that policy as required by the parties' martial settlement agreement (MSA). Mark acknowledged that his life insurance policy lapsed but argued that, due to his age and previous health problems, he could no longer obtain a replacement policy and that his obligation to provide a life insurance policy should be discharged under the doctrine of impossibility. The circuit court rejected Mark's impossibility defense and ultimately ordered Mark to set aside $250,000 in an account with rights of survivorship in favor of him and Irene. Irene requested attorney fees under section 508 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508 (West 2018)) and under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). The circuit court denied all of Irene's requests for attorney fees under Rule 137 and under section 508.

¶ 3    On appeal, Irene contends that the circuit court abused its discretion by denying her fee petitions. She also argues that the circuit court erred by only giving her a right of survivorship in the account holding the $250,000 rather than naming her the sole owner of the account. Mark's cross-appeal argues that the circuit court lacked jurisdiction to modify his obligations under the MSA and that the only justiciable matter before the circuit court was Irene's contempt petition. He contends that the circuit court erred by not discharging his obligation to provide a life insurance policy due to impossibility. He further argues that the circuit court erred by modifying his life insurance obligations in a contempt proceeding because Irene never asserted a breach of contract claim based on Mark's failure to maintain a life insurance policy.

¶ 4    For the reasons that follow, we affirm in part and reverse in part and remand for further proceedings.

¶ 5                                    I. BACKGROUND

¶ 6     Mark's and Irene's marriage ended in March 1996 with a judgment of dissolution of marriage that incorporated an MSA. Relevant to the issues on appeal, the MSA provided that Mark was obligated to pay maintenance. He was also required to keep and maintain a life insurance policy naming Irene as the beneficiary. Section 13.1 of the MSA provided that Mark

> "shall keep and maintain in full force and effect a policy or policies of life insurance on his life in the amount of Two Hundred Fifty Thousand ($250,000.00) naming [Irene] as the sole and irrevocable beneficiary thereof. [Mark] shall provide on an annual basis proof of payments and the existence of said policy."

It is undisputed that at the time of the dissolution of marriage, Mark maintained a $250,000 life insurance policy with Northwestern Mutual Life Insurance that he procured in 1989. It is also undisputed that the policy was a term policy that would expire when Mark turned 70 years old.

¶ 7     In April 2016, Irene filed a petition for a finding of indirect civil contempt, which is at issue in this appeal. She alleged in relevant part that Mark had not maintained a $250,000 life insurance policy as required under section 13.1 of the MSA. For relief, Irene sought a rule to show cause as to why Mark should not be held in indirect civil contempt for failing to comply with the MSA, an order requiring Mark to obtain and maintain a life insurance policy that complied with section 13.1 of the MSA, or in the alternative, "to deposit $250,000 in trust or escrow account to be paid to Irene or her estate upon his death," and attorney fees in the event that Mark was found to be in indirect civil contempt.

¶ 8     Mark responded to the petition. He also filed a complaint seeking a declaration that several of his obligations under the MSA were unenforceable, had been satisfied, or should be rescinded because his performance was objectively impossible. Irene moved to dismiss Mark's entire

complaint for declaratory judgment, which the circuit court ultimately granted. Mark does not raise any argument on appeal regarding the dismissal of his complaint for declaratory relief.

¶ 9 In Mark's amended response to Irene's petition for a rule to show cause he asserted that he had been diagnosed with diabetes and cancer, he had not earned any income from his business since 2015, and his business closed in early 2016. With respect to the allegation that he failed to maintain a life insurance policy, he claimed that "[Irene] and Mark had reached an agreement as reflected in their MSA that Mark was to keep and continue his already-existing term policy though the end of its term—which he did through age 70[.]" He argued that the obligation to provide a life insurance policy was in the nature of support and was modifiable, and that the life insurance policy was "to secure [his] maintenance obligation, thereby providing for Irene's care and support."

¶ 10 In March 2017, Irene filed a petition for $56,000 in interim attorney fees under sections 501(c-1)(1) and 508 of the Act (750 ILCS 5/501(c-1)(1), 508 (West 2016)). After briefing, the circuit court denied Irene's petition for interim fees without prejudice to her seeking attorney fees at the end of the litigation, finding that both parties had the ability to pay their own attorney fees. Irene's motion to reconsider was denied after briefing.

¶ 11 On August 16, 2017, the circuit court conducted a hearing on Irene's petition for a finding of indirect civil contempt and for other relief. The circuit court heard testimony from the parties and admitted numerous documents into evidence. The circuit court found "good cause justification for [Mark's] noncompliance with the terms" of section 13.1 of the MSA. The circuit court observed, however, that "the section 13.1 language is forever" and there was nothing in the MSA that would support a finding that Mark's obligation to maintain a life insurance policy ended at the expiration of the term life insurance policy he already had in place. The circuit court concluded

that the obligation to provide a life insurance policy "remains in full force and effect." The circuit court ordered Mark to apply for a life insurance policy and stated that if it were not possible for Mark to obtain such a policy, the court would "go to Plan B." The circuit court did not elaborate any details of "Plan B" on the record. The circuit court did not find Mark in contempt and Irene has not sought appellate review of that ruling.

¶ 12    At a September 26, 2017, hearing, the circuit court heard that Mark had applied for a life insurance policy in May 2017 and that his application was denied in August 2017. In November 2017, with leave of court, Mark filed affirmative defenses with respect to his life insurance obligation. Two of those defenses are relevant to this appeal. First, Mark asserted that it was impossible for him to comply with section 13.1 of the MSA and that his performance should be excused. Second, he asserted that the terms of the MSA were nonmodifiable and provided no alternative remedies to Irene. He alleged that "fashioning any other relief constitutes an impermissible modification of the MSA." He alleged that the MSA required Mark to maintain a life insurance policy but did not contemplate Mark establishing any kind of account or trust in lieu of an insurance policy.

¶ 13    Irene moved to strike and dismiss Mark's affirmative defenses, arguing in part that Mark never raised his affirmative defenses in his response to Irene's August 2016 petition. She further argued that Mark had asserted his affirmative defenses in his complaint for declaratory judgment, which the circuit court dismissed. After briefing, argument, and considering the evidence presented during the contempt hearing, the circuit court entered a written order on April 5, 2018, and made the following findings. The doctrine of impossibility did "not absolve[ ] [Mark] of his contractual duty to maintain a life insurance policy with Irene as the beneficiary." Mark had "not demonstrated that all other practical methods of performance are impossible." The purpose of section 13.1 of the

MSA was to ensure that Irene "would receive a payment in the event of Mark's prior death," and that to achieve that purpose, Mark could hold $250,000 in an account for the benefit of Irene should Mark predecease her. Mark's obligation to maintain a life insurance policy was "to secure his maintenance obligation, which terminates upon either party's death." Mark's affirmative defense of impossibility was "denied," and he was ordered to set aside $250,000 in an account, which would be transferred to Irene if Mark predeceased her. If Irene predeceased Mark, the account would become Mark's property.

¶ 14    Both parties moved to modify the April 5, 2018, order. Irene also filed a petition for attorney fees pursuant to Rule 137 and section 508 of the Act. On October 31, 2018, after briefing and argument, the circuit court modified the April 5, 2018, order to provide that Mark would deposit $250,000 into an account titled "Mark T. Ulanov and Irene Ulanov, as joint tenants with right of survivorship, subject to court order." Any accrued interest on the account would be paid to Mark, and the account would not be subject to the claims of creditors of either party. Also on October 31, 2018, the circuit court denied Irene's petition for attorney fees. No evidentiary hearing was held on Irene's fee petition.

¶ 15    Irene filed a timely notice of appeal on November 28, 2018. Mark filed a timely notice of cross-appeal on December 6, 2018.

¶ 16                                    II. ANALYSIS

¶ 17    At the outset, we remind counsel for both parties that Supreme Court Rule 342 (eff. July 1, 2017) requires that an appellant's brief contain an appendix consisting of

> "a table of contents for the appendix, the judgment appealed from, any opinion, memorandum, or findings of fact entered by the trial judge[,] *** any pleadings or other materials from the record that are the basis of the appeal or pertinent to it, the

notice of appeal, and a complete table of contents, with page references, of the

record on appeal."

Neither Irene's appellant's brief nor Mark's appellee/cross-appellant's brief contain any appendix

at all, in violation of Rule 342. We remind all counsel that our supreme court's rules governing

appellate briefs are mandatory rather than advisory or aspirational (*In re Marriage of Hluska*, 2011

IL App (1st) 092636, ¶ 57), and we caution that future violations will not be tolerated.

¶ 18     Turning to the merits of the appeal and cross-appeal, we find it more logical to first address

the arguments raised by Mark in his cross-appeal, which bear on the validity of the circuit court's

underlying orders.

¶ 19     Mark argues that the circuit court lacked jurisdiction to do anything other than adjudicate

Irene's contempt petition because that was the only pleading before the circuit court, and the circuit

court exceeded its jurisdiction by addressing a property disposition issue. Relatedly, he argues that

the circuit court lacked jurisdiction to impose new obligations on Mark that were not contemplated

by the parties' MSA. He contends that there is a jurisdictional difference between the circuit court

enforcing the terms of an MSA—which derives from the circuit court's inherent authority to

enforce the terms of a judgment—and the circuit court imposing new obligations more than 30

days after a final judgment. We are not persuaded that the circuit court exceeded its jurisdiction.

¶ 20     The Act provides that "[t]he provisions as to property disposition may not be revoked or

modified, unless the court finds the existence of conditions that justify the reopening of a judgment

under the laws of this State." 750 ILCS 5/510(b) (West 2016). After 30 days, "property provisions

in a[n] MSA are not modifiable, but a trial court has jurisdiction to modify property distribution if

circumstances exist that give cause to reopen a judgment as in other civil cases" such as fraud,

coercion, or misrepresentation. *In re Marriage of O'Malley ex rel Godfrey*, 2016 IL App (1st)

151118, ¶ 42 (citing *In re Marriage of Hall*, 404 Ill. App. 3d 160, 164 (2010)). "Property rights created by a judgment of dissolution become vested when the judgment is final, and a trial court lacks general jurisdiction to modify an order affecting these rights." *In re Marriage of Hubbard*, 215 Ill. App. 3d 113, 116 (1991). The circuit court, however, has "indefinite jurisdiction to enforce the terms of a judgment that included a[n] MSA ***." *Id.*

¶ 21   We reject Mark's argument that the circuit court did not have the jurisdiction to adjudicate anything other than Irene's contempt petition. He contends that "the only justiciable issue before the trial court raised in Irene's [c]ontempt petition was whether Mark willfully and contumaciously failed to comply with the parties' [j]udgment." Mark's argument ignores that Irene's August 2016 petition specifically sought to enforce Mark's obligation under—and sought relief for Mark's noncompliance with—section 13.1 of the MSA. The issue of Mark compliance with the agreement was clearly before the circuit court. The circuit court had authority to adjudicate Irene's request for relief given her allegation that Mark breached the MSA and her request to enforce an express term in the MSA. See *In re Marriage of O'Malley ex rel Godfrey*, 2016 IL App (1st) 151118, ¶ 36 (observing that "[a] trial court can determine whether a party to a[n] MSA violated the agreement between the parties. [Citation.] Judges in the domestic relations division make these decisions almost on a daily basis."). Mark's argument that the circuit court somehow exceeded its authority by addressing Irene's enforcement claim is unavailing.

¶ 22   We also find that the circuit court was enforcing the MSA and we disagree with Mark that the circuit court exceeded its authority by imposing additional obligations on Mark that were not set forth in the parties' MSA. Mark contends that the MSA never contemplated him paying $250,000 of his own money to comply with section 13.1 of the MSA. He argues that the circuit court cannot engraft new obligations onto a dissolution of marriage judgment or equitably modify

the judgment. He relies on *In re Marriage of Waggoner*, 78 Ill. 2d 50 (1979), *In re Marriage of Clark*, 149 Ill. App. 3d 613 (1986), *In re Marriage of Milliken*, 199 Ill. App. 3d 813, 820 (1990), and *In re Marriage of Hubbard*, 215 Ill. App. 3d 113 (1991), to support his argument. Those cases, however, are distinguishable because they all involved a party's attempt to obtain relief that would have required a property disposition that was inconsistent with the express terms of the dissolution judgment or would have required modifying a property disposition provided for in the MSA. Here, Irene specifically sought to enforce Mark's contractual obligation to provide her with a death benefit if he predeceased her—an obligation expressly set forth in the MSA itself.

¶ 23    In *Waggoner*, the parties' dissolution of marriage judgment provided that the plaintiff, Mary, would "retain the residence of the parties, the motor vehicle and furnishings, *subject to the indebtedness on said items*." (Emphasis added.) 78 Ill. 2d at 51. More than 30 days after the judgment became final, Mary filed a motion requesting that the circuit court order the defendant, John, to remove a judgment lien and second mortgage on the residence. *Id.* The circuit court denied Mary's motion and this court affirmed. *Id.* Our supreme court affirmed, finding that the circuit court lacked subject-matter jurisdiction to hear Mary's motion because the motion sought "to compel [John] to remove the judgment lien and the second-mortgage lien from the chain of title[,]" while the dissolution judgment "did not provide that [John] was to perform these acts." *Id.* at 53-54. The judgment clearly stated that Mary would obtain the residence subject to the indebtedness. Mary's motion did not "not seek to enforce the terms of the decree, but instead to graft new obligations onto the decree." *Id.* at 54.

¶ 24    Here, unlike in *Waggoner*, Mark's obligation to do the thing Irene's petition sought was set forth in the MSA. Mark was required to (1) "keep and maintain in full force and effect a policy or policies of life insurance on his life in the amount of Two Hundred Fifty Thousand

($250,000.00);" (2) name Irene "as the sole and irrevocable beneficiary thereof;" and (3) "provide on an annual basis proof of payments and the existence of said policy." Irene did not seek to impose additional requirements on Mark that were not established by the MSA.

¶ 25    In *Clark*, the parties' dissolution of marriage judgment, in relevant part, awarded the plaintiff, Madonna, the marital residence. 149 Ill. App. 3d at 614. After the judgment became final, the defendant, Thomas, filed a petition seeking to compel Madonna to transfer possession of the marital residence to him through a quitclaim deed. *Id.* The circuit court denied Thomas's petition, and we affirmed. Under the terms of the dissolution judgment, Thomas had "the right to elect to buy out the plaintiff's interest by paying half of the difference between the outstanding mortgage and taxes due at the time he exercised such option and the market value at the time of the judgment, $72,000.00." *Id.* at 617. Madonna was originally not required to pay the mortgage, taxes, or insurance until a date certain, but was subsequently ordered to assume responsibility for those expenses and expenses for maintaining the property. *Id.* Madonna failed to make any payments related to the residence, resulting in foreclosure proceedings. *Id.* We held that the circuit court had no jurisdiction to grant Thomas's petition because he was seeking a quitclaim deed, "which clearly placed the matter within the realm of the division of property." *Id.* at 618. Furthermore, his petition would have required the circuit court to "void the buy-out provision specified in the judgment," which would require modifying the dissolution judgment. *Id.*

¶ 26    In *Milliken*, the parties' 1985 judgment of dissolution of marriage expressly provided that the respondent, James, "shall be solely responsible for, and shall hold [the petitioner, Grace] harmless of any liability *** for the debt of [James] to [Grace's brother, Owen], in the amount of $3,000." 199 Ill. App. 3d at 814. James never paid, and three years after the dissolution judgment, Grace paid Owen $3810—$3000 in principal and $810 in interest—and then petitioned the circuit

court seeking reimbursement from James. *Id.* at 814-15. The circuit court ordered James to reimburse Grace, but we reversed. We primarily relied on *Waggoner* to support our finding that the circuit court lacked jurisdiction to grant Grace any relief because the parties' judgment of dissolution did not make James and Grace jointly liable for the debt to Owen. *Id.* at 819. Instead, the judgment provided that James was solely liable for the debt, and nothing in the dissolution judgment established that Grace was liable for the debt in any manner. *Id.* at 820. Therefore, Grace's petition for reimbursement was not seeking to enforce the judgment but instead sought to alter it. *Id.*

¶ 27    Here, unlike in *Milliken* and *Clark*, Mark's insurance obligation is set forth in the parties' MSA. Irene's petition did not seek anything that was not set forth in the MSA and requiring Mark to comply did not result in any provision of the MSA being voided or a reallocation of the MSA's property division.

¶ 28    Finally, in *Hubbard*, the judgment of dissolution of marriage provided that the parties' debts were to be paid from the sale of the marital home and that both parties were barred from receiving maintenance. 215 Ill. App. 3d at 114. More than 30 days after the judgment, the petitioner, Carol, filed a petition requesting that the respondent, John, be ordered to pay for debts that Carol incurred and would incur while preparing the marital residence for sale. *Id.* at 115. The circuit court ordered John to pay a portion of the costs of repairs. *Id.* On appeal, we reversed, relying in part on *Waggoner*, *Clark*, and *Milliken*, among others. We found that the circuit court lacked jurisdiction to order John to pay a portion of the expenses because "the judgment did not provide that [John] was to pay any part of the cost of preparing the marital residence for sale." *Id.* at 118. Furthermore, "the judgment stated that [Carol] was awarded 'the remaining net proceeds of sale of the marital real estate.' " *Id.*

¶ 29     The principle set forth in *Waggoner*, *Clark*, *Milliken*, and *Hubbard* is that the circuit court cannot modify the disposition of property in the judgment for dissolution of marriage unless there is some basis for reopening the judgment itself. Where a party seeks relief that is contrary to or not contemplated by the express terms of the judgment of dissolution of marriage, the circuit court lacks jurisdiction to grant such relief. That is simply not the case here. Mark's obligation to keep and maintain life insurance for the benefit of Irene is provided for in the MSA and judgment. The MSA gave Irene a property right in the death benefit from Mark's life insurance policy. Irene's petition did not seek to impose an obligation on Mark not found in the MSA, but instead sought to enforce an obligation clearly set forth in the MSA. We therefore find that the circuit court had jurisdiction to enter an order enforcing Mark's obligation to provide Irene with a death benefit.

¶ 30     Next, Mark argues that the circuit court should have discharged his obligation under section 13.1 of the MSA under the doctrine of impossibility. On appeal, he argues that he demonstrated that his compliance with section 13.1 was objectively impossible due to his age and health. We disagree.

¶ 31     "The doctrine of legal impossibility, or impossible performance, excuses performance of a contract only when performance is rendered objectively impossible either because the subject matter is destroyed or by operation of law." *Innovative Modular Solutions v. Hazel Crest School Dist. 152.5*, 2012 IL 112052, ¶ 37 (citing *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 7, (2010)). "The party advancing the doctrine must show that the events or circumstances which he claims rendered his performance impossible were not reasonably foreseeable at the time of contracting." *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 6-7 (citing *Illinois–American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106 (2002)).

"The doctrine of impossibility of performance requires that the circumstances creating the impossibility were not and could not have been anticipated by the parties, that the party asserting the doctrine did not contribute to the circumstances, and that the party demonstrate that it has tried all practical alternatives available to permit performance." *Illinois American Water Co.*, 332 Ill. App. 3d at 1106 (citing *Farm Credit Bank of St. Louis v. Dorr*, 250 Ill. App. 3d 1, (1993)).

"Where a contingency that causes the impossibility might have been anticipated or guarded against in the contract, it must be provided for by the terms of the contract or else impossibility does not excuse performance." *YPI 180 N. LaSalle Owner*, 403 Ill. App. 3d at 7.

¶ 32    Here, section 13.1 of the MSA unequivocally states that Mark

"shall keep and maintain in full force and effect a policy or policies of life insurance on his life in the amount of Two Hundred Fifty Thousand ($250,000.00) naming [Irene] as the sole and irrevocable beneficiary thereof. [Mark] shall provide on an annual basis proof of payments and the existence of said policy."

There is nothing ambiguous about Mark's obligation to keep and maintain a life insurance policy, and there is no temporal limit on how long Mark was required to keep and maintain such a policy. There are no provisions in the MSA that contemplate Mark allowing a life insurance policy to lapse or that contemplate his potential uninsurability. At the time the parties executed the MSA, Mark might not have known of his future health problems, but it was reasonably foreseeable that a term life insurance policy that would expire at the age of 70 would be insufficient to comply with his continuing obligation to maintain a life insurance policy if he lived past 70. At the time, Mark was apparently in good health, and he does not make any argument as to whether, when the parties executed the MSA, he expected to reach the age of 70. Furthermore, Mark does not identify any

efforts that he made in the years leading up to the lapse of his term life insurance policy to comply with section 13.1. Instead, he asserts that after he had already breached his obligation to maintain a life insurance policy, he could not obtain a new policy due to his health. In other words, Mark's inaction in the face of an unambiguous contractual requirement contributed to his inability to comply with section 13.1. Having failed to guard against the lapse of his life insurance coverage, knowing full well that his existing policy would expire on a date certain, Mark cannot seek to avoid his obligation under section 13.1 of the MSA on impossibility grounds.

¶ 33    Mark argued in the circuit court—but not in this court—that Irene knew that the policy he had in place at the time of the divorce was a term policy that would end when he turned 70 years old. But nothing in the MSA specifically referenced the policy that Mark already had; there is simply nothing in the parties' written agreement to suggest that Irene agreed that Mark's existing term life insurance policy was sufficient to satisfy section 13.1. Furthermore, as the circuit court observed, the purpose of Mark's life insurance obligation was to provide Irene with a payment if Mark predeceased Irene to secure his maintenance obligation. And, as the circuit court observed, impossibility is unavailable where there are practical alternatives available to permit performance. We see no error in the circuit court's rejection of Mark's affirmative defense of impossibility.

¶ 34    Irene raises one issue in her appeal directed at the circuit court's judgment relative to Mark's life insurance obligation. She argues that the circuit court erred by only giving her a right of survivorship in the account holding the $250,000 rather than naming her the sole owner of the account. She contends that section 13.1 of the MSA required Mark to name her as an irrevocable beneficiary, giving her an "absolute right to receive $250,000 upon Mark's death." She argues— without citing to the record or to any authority—that by virtue of being named an irrevocable beneficiary, "the money was Irene's, whether she received it on Mark's death or it went to her

estate if she predeceased him." In response, Mark argues that Irene waived this argument because she expressly asked the circuit court to award her a right of survivorship, and she is therefore barred from taking a contrary position on appeal. Alternatively, he argues that, as the circuit court found, section 13.1. of the MSA was designed to secure Mark's maintenance obligation and not to guarantee that Irene and her eventual estate would receive the $250,000. We find no merit to Irene's argument.

¶ 35    In the circuit court, Irene initially argued that if she predeceased Mark, the proceeds of any life insurance policy would be paid to her estate upon Mark's death because there was nothing in the MSA to suggest that the life insurance policy merely secured Mark's maintenance obligation. The circuit court did not agree, and Irene eventually took the position that the parties should have a right of survivorship in the account holding the $250,000. We need not decide whether Irene is barred from challenging the survivorship aspect of the circuit court's judgment because her argument fails regardless. Irene does not cite any authority or any aspect of the record to support her underlying theory that when a beneficiary to a life insurance policy dies, the beneficiary's estate becomes—or has a right to become—the new beneficiary. Unless otherwise defined by the insurance policy itself, when a beneficiary of a life insurance policy dies, the policy holder ordinarily has the right to new name a new beneficiary. Nothing in the parties' MSA or in the record on appeal reflects that Irene's estate would be substituted as the irrevocable beneficiary of the life insurance policy upon Irene's death. Instead, the MSA reflects that Irene was to be named the irrevocable beneficiary, which, by its own terms, means that Mark could not change the beneficiary designation during his lifetime. Nothing in MSA or in the record suggests that Irene's estate had a right to become a successor beneficiary to Mark's life insurance policy. In the absence of any authority to support her position, we have no basis from which to conclude that the circuit

15

court erred. The circuit court reasonably concluded that, if Irene predeceased Mark, Mark would keep the account holding the $250,000 along with any accrued interest. Irene's right to be named as a beneficiary only created a contingent right in $250,000, the contingency being Mark predeceasing Irene. The circuit court did not err in giving Mark a right of survivorship in the account.

¶ 36    In sum, Irene's petition clearly presented the circuit court with the issue of Mark's failure to comply with the MSA and whether to enforce his obligation to provide Irene with a death benefit in the event that he predeceased her. Under the MSA, Irene had a right to be named as "the sole and irrevocable beneficiary" of a $250,000 life insurance policy, and the circuit court's order did not modify Mark's obligation, but instead enforced it. The circuit court did not err by rejecting Mark's impossibility defense because Mark—the one claiming impossibility—was the one who allowed his term life insurance policy to lapse at a time that he was likely uninsurable. Furthermore, at the time the parties executed the MSA, it was reasonably foreseeable that the term life insurance policy would lapse when Mark reached 70 years old, making it unavailable to satisfy section 13.1, and Mark does not argue that it is impractical or impossible for him to set aside $250,000. The circuit court looked to the intent of the parties and the purpose of section 13.1 and concluded that Mark could meet his contractual obligation to Irene by depositing $250,000 in an account for the benefit of Irene should Mark predecease her, with a right of survivorship. We see no error in the circuit court's analysis or conclusion.

¶ 37    Next, Irene argues that the circuit court abused its discretion by denying her requests for attorney fees under section 508 of the Act and Rule 137. She essentially argues that the circuit court failed to consider whether requiring her to pay her own fees would strip her of her means of support or undermine her financial stability. She further asserts that, even though the circuit court

did not find Mark in contempt, section 508(b) is a basis for awarding her attorney fees because she was forced to litigate due to Mark's noncompliance with the MSA. She also contends that she was entitled to attorney fees under Rule 137 because Mark's declaratory judgment complaint and his attempts to modify his obligations under the MSA without providing a basis for reopening the judgment were not well grounded in fact or law.

¶ 38    First, we reject Irene's argument that she was entitled to attorney fees under Rule 137 because she has not presented an adequate basis for this court to reverse the circuit court's judgment. Her argument on this point is conclusory and not supported by any citations to relevant authority. Her failure to develop and advance an argument supported by relevant authority results in forfeiture. Ill. S. Ct. R. 341(h)(7). We therefore affirm the circuit court's denial of Irene's request for attorney fees under Rule 137.

¶ 39    Next, we consider Irene's argument that the circuit court abused its discretion by denying her section 508 petition for attorney fees. She primarily contends that the circuit court applied the wrong standard when it determined that Irene had the ability to pay her own fees because the circuit court should have considered "whether requiring Irene to pay her fees would strip her of her means of support or undermine her financial stability." We agree.

¶ 40    Ordinarily, we review the circuit court decision on a fee petition for an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205. The circuit court "abuses its discretion when no reasonable person would agree with the decision [citation], or when it bases its decision on an incorrect view of the law." *In re Marriage of Izzo*, 2019 IL App (2d) 180623, ¶ 26. A determination of the correct standard to be applied by the circuit court is a question of law subject to *de novo* review. *Id.*

17

¶ 41 Section 508(a) of the Act provides, in relevant part, that the circuit court may order a party to pay a reasonable amount of the other party's attorney fees in connection with maintaining or defending any action under the Act, the enforcement or modification of an order or judgment under the Act, or any ancillary litigation incident to, or reasonably connected with, proceedings under the Act. 750 ILCS 5/508(a)(1), (2), (6) (West 2018). "Section 508 governs attorney fees generally, including petitions for contribution of attorney fees and costs incurred in postdecree proceedings and initial dissolution proceedings." *Blum v. Koster*, 235 Ill. 2d 21, 46 (2009). In ruling on a petition for contribution of attorney fees, the circuit court "must (1) consider the financial resources of the parties and (2) make its decision on a petition for contribution in accordance with subsection (j) of Section 503." (Internal quotation marks omitted.) *Heroy*, 2017 IL 120205, ¶ 19 (citing 750 ILCS 5/508(a) (West 2014)). Section 503(j)(2) provides that when the circuit court decides a petition for contribution of attorney fees, "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." *Id.* Section 503(d) identifies 12 factors for the circuit court to consider when dividing marital property. 750 ILCS 5/503(d) (West 2018).

¶ 42 While courts have often recited that a party seeking attorney fees must first establish their inability to pay (see *Heroy*, 2017 IL 120205, ¶ 15 (collecting cases)), our supreme court has clarified that the standard is more nuanced. As the court explained in *Heroy*, "[a] party is unable to pay [their own attorney fees] if, after consideration of all of the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Id.* "[F]inancial inability to pay does not demand a showing of destitution, and the fee-seeking spouse is not required to divest himself of capital assets before requesting fees."

18

*In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1085 (1997). "It is sufficient to show payment would exhaust his estate or strip him of his means of support or undermine his economic stability." *Id.*

¶ 43 Here, the circuit court made no findings as to whether requiring Irene to pay all the attorney fees she incurred pursuing her petition for rule to show cause and enforcement action would undermine her financial stability. Irene's petition for attorney fees asserted that she was 71 years old and unemployed. As of the end of April 2018, she had paid her attorneys $21,500 and owed a balance of over $65,000. By the time of the circuit court's hearing in July 2018, Irene's counsel argued that she owed over $85,000 in fees. According to her financial affidavit, dated March 21, 2017, Irene had a net monthly income of $3373.50, monthly living expenses of $3323.22, and was paying $1000 per month toward attorney fees, resulting in a monthly deficit of $950. She had less than $17,000 in her bank and brokerage accounts, $40,000 in retirement funds, and owns a $300,000 home with no mortgage. In his written response to Irene's petition, Mark asserted that he was 72 years old, no longer employed, in poor health, had less than $650,000 in his bank accounts, and "runs a substantial deficit of approximately $7300 per month." The circuit court, after considering the parties' financial affidavits and hearing argument, concluded that Irene could afford her own attorney fees based on her income ($3000 per month in maintenance and her social security) and her other assets. The circuit court stated that that "the standard is always does one party have the ability to pay her fees," and observed that while Mark might have more assets than Irene, "that's not the standard."

¶ 44 As *Heroy* and the cases discussed therein instruct, the circuit court should have considered both Irene's and Mark's financial resources and the statutory factors when determining whether to order Mark to contribute to Irene's attorney fees. In determining whether Irene could afford to pay

her attorney fees, the circuit court should have examined whether requiring Irene to pay all her attorney fees would undermine her financial stability. Her petition laid bare that her future income and available liquid assets would be dwarfed by her attorney fees. The circuit court did not expressly conduct this kind of analysis or make any findings on the record other than that Irene could afford to pay her attorneys, and therefore did not expressly exercise its discretion when ruling on Irene's petition. Under these circumstances, where the circuit court expressly applied the wrong standard and did not properly exercise its discretion, we reverse the circuit court's denial of Irene's petition for attorney fees under section 508 and remand to the circuit court so that it can apply the correct standard to Irene's fee request.

¶ 45    As a final matter, Irene argues that she was entitled to attorney fees because they were incurred in enforcing her rights under the MSA. She asserts that while she was not entitled to mandatory attorney fees under section 508(b)—which mandates the recovery of attorney fees where the circuit court finds "that the failure to comply with [an] order or judgment was without compelling cause or justification" (750 ILCS 5/508(b) (West 2018))—the circuit court still should have considered whether she incurred fees as a result of Mark's conduct, both in letting his life insurance policy lapse and in driving up the cost of litigation by attempting to modify a nonmodifiable judgment. On remand, the circuit is free to consider Irene's arguments that she is entitled to fees due to Mark's conduct in driving up the cost of the litigation.

¶ 46                                III. CONCLUSION

¶ 47    For the foregoing reasons, the judgment of the circuit court rejecting Mark's impossibility defense and requiring Mark to self-insure to comply with his obligations under the MSA is affirmed. We also affirm the circuit court's denial of Irene's request for attorney fees under Rule

137. We reverse the circuit court's denial of Irene's request for attorney fees under section 508 of the Act, remand for further proceedings consistent with this order.

¶ 48    Affirmed in part and reversed in part; remanded.