NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200404-U

NO. 4-20-0404

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| DAWN M. OETTEL, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Sangamon County |
| and | ) | No. 16D458 |
| JOSEPH S. OETTEL, | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Jack D. Davis II, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's order of June 6, 2019, was an enforcement order and not a modification of the property division of a previously entered judgment of dissolution of marriage, and the court's order of July 22, 2020, was neither a modification of that order nor of the prior judgment.

¶ 2         After several years of litigation, the parties were divorced in February 2018, and as part of the judgment, the trial court entered an order establishing maintenance and dividing the marital property of the parties between them. Postjudgment litigation then proceeded primarily on those two issues. Petitioner, Dawn M. Oettel (Dawn), filed several petitions seeking enforcement of the court's orders, which resulted in subsequent orders entered by the trial court on June 6, 2019, and July 22, 2020. Respondent, Joseph S. Oettel (Joe), argued the trial court's orders were modifications of the original property division and that the trial court lacked

jurisdiction so long after entry of the judgment. Dawn argued, and the trial court found, instead, the orders were efforts to enforce the terms of the court's previous judgment.

¶ 3    On appeal, Joe continues to claim the trial court lacked jurisdiction to enter the July 22, 2020, order because it sought to modify the terms of the June 6, 2019, order, both of which are improper attempts to modify the terms of a property division. We disagree.

¶ 4                            I. BACKGROUND

¶ 5    The parties were married on July 23, 1994, and the marriage was dissolved by a judgment of dissolution of marriage (Judgment) entered February 13, 2018. The property division regarding the marital residence (Falcon Point) required the residence to remain listed for sale and for both parties to cooperate with the realtor to market it. Respondent, who continued to occupy the residence, was responsible for all mortgage payments, utilities, property taxes, and "other reasonable expenses associated with his residence at the home." Upon sale and satisfaction of any indebtedness on the home, Joe was entitled to reimbursement for one-half the cost of any repairs made, as well as any paydown on the principal, and the parties would split the net proceeds evenly. A commercial property (Iles property), also subject to sale and division, is not directly involved in the issues raised by this appeal. We take the time to outline the procedural history of the litigation in some detail to elucidate the circumstances surrounding the challenged orders in this appeal.

¶ 6    After the Judgment was entered, petitioner sought to obtain Joe's compliance with the terms of the Judgment as it related to the sale of the residence, leading ultimately to hearings in February and April 2019 on a series of pleadings filed by Dawn seeking enforcement or modification of the Judgment and findings of contempt against Joe. Written arguments of the parties were submitted in May 2019, with Joe contending, among other things, Dawn's

suggestions for relief "[are] an attempt to redo the property division of the Judgment *** for which the court lacks jurisdiction and the ability to do so."

¶ 7        Those suggestions included Joe buying out her interest in the marital residence by establishing her share of equity based on a reduced price of $505,000, a proposal Joe approved, minus any credits to which Joe was entitled for repairs and payments in accordance with the terms of the Judgment, or, if unable to obtain financing to do so, payment of her share upon sale of the commercial property. Dawn also suggested reducing the price of the Falcon Point property to an amount consistent with the realtor's recommendations and selling the property "as is" without the various repairs otherwise considered necessary before sale.

¶ 8        Dawn argued her suggested remedies were not an improper modification of the property division but instead, consistent with the trial court's retained jurisdiction to enforce its own orders. She also argued both parties had "revested" jurisdiction in the trial court by presenting evidence on the issue without objection by the other.

¶ 9        The trial court's written order, filed in June 2019, found Joe was in indirect civil contempt for failing to pay maintenance as ordered, granted his request for a downward modification of maintenance, granted his request to address an Internal Revenue Service debt by requiring the parties to amend their tax returns, and found Joe in indirect civil contempt for failing to comply with the court's previous order regarding the listing of the Iles property. Addressing the Falcon Point residence, the trial court began by noting the terms of the previous order and held, "[b]ased upon the evidence, the court finds Joe has failed to cooperate with the recommendations of the realtor concerning lowering the sales price" and has "refused to cooperate with the marketing of the marital residence." The trial court declined to find Joe in contempt in this regard, as requested by Dawn, because it also found "he did not have the

- 3 -

resources necessary to address the repairs." The trial court recognized Joe's claim the court no longer had jurisdiction to modify the division of property and that Dawn's request amounted to an impermissible modification of the Judgment's property division but disagreed, finding it retained jurisdiction to enforce the terms of the Judgment.

¶ 10     The trial court ordered Joe to buy out Dawn's interest in the Falcon Point residence, valued at the suggested price of $505,000, by securing financing within 45 days sufficient to pay Dawn her equity share minus "any bona fide credits he may have under the provisions of the Judgment." Alternatively, if unable to obtain financing, Dawn was to receive her share of the equity (minus credits due Joe) from the sale of the Iles property. No posttrial motions were filed and no appeal taken from the court's ruling of June 2019.

¶ 11     Dawn filed a supplemental petition for rule to show cause in early April 2020 and a motion for entry of judgment later in the same month. In the supplemental petition she alleged, among other things, that Joe failed to obtain the necessary financing to purchase her interest in the Falcon Point residence or explain his inability to do so, and he failed to cooperate with the realtor to show the residence to an interested party. Dawn claimed Joe was "attempting to delay and prevent sale of the residence, thus preventing the Petitioner from receiving funds due her," and she asked the trial court to order Joe to reduce the sale price to the previously recommended $505,000 to increase the likelihood of sale. The motion for judgment asked that judgment be entered on the amounts owed by the trial court's previously ordered buy-out, as well as amounts owed in unpaid spousal support and attorney fees.

¶ 12     Joe responded to the motion for judgment by filing a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 2-619.1 (West 2018)), arguing, *inter alia*, Dawn sought a modification of the previously ordered property

settlement, for which the trial court lacked jurisdiction. Claiming that Dawn's motion for entry of judgment was insufficient as a matter of law, Joe also sought dismissal under section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)). The parties then traded responses and replies on the issues through May 2020. After a hearing by telephone, in the trial court's docket entry order of May 22, 2020, the court found it retained jurisdiction to enforce its orders and intended to do so. The parties were ordered to cooperate with the realtor to resolve the sale of the Falcon Point property, and the issue regarding Dawn's equity and Joe's credits was reserved.

¶ 13        The trial court also reserved issues relating to maintenance and set the matter for further hearing in June 2020. Before that, Dawn filed a second supplemental petition for rule to show cause and motion for entry of judgment, claiming Joe continued to refuse to follow the recommendations of the realtor, including recommendations on pricing, that his failure to do so was causing Dawn additional legal expenses, and he should be held in contempt, assessed all costs, and jailed as a result. Two days later, Joe filed a motion to reconsider, asking the trial court to "reconsider" its May 22, 2020, ruling by allowing him to obtain opinions from other realtors regarding the list price for an "as is" sale of the home as suggested by the realtor. After a phone conference to discuss scheduling a hearing on the motion, Dawn then filed a third supplemental petition for rule to show cause and motion for entry of judgment, contending Joe had contacted another realtor and indicated the Falcon Point home was no longer on the market, that Dawn no longer had equity in the home, and in fact, she owed him money; all of which she said was violative of the court's previous orders and warranted a finding of contempt.

¶ 14        The trial court's written order, reflecting the results of the hearing on Joe's motions on July 22, 2020, specifically noted:

"The parties had discussions with the Court, commenting on the impact of the June 6, 2019[,] Order, and the Court confirms that Order required that Joe buy out Dawn's equity in the Falcon Point residence at $505,000.00, less *bona fide* credits due Joe up to June 6, 2019. The discussions which occurred in open court were not, and shall not be, considered a change or modification of the June 6, 2019[,] ruling by the court."

¶ 15 The trial court went on to order the Falcon Point residence remain for sale, with Joe to choose the realtor and listing price as part of its ruling granting Joe's motion for reconsideration. He was to cooperate with the realtor's recommendations, and it was understood that Dawn's signature, if required on the listing agreement, did not prejudice her buy-out at $505,000.

¶ 16 Joe filed a notice of appeal from the July 22, 2020, order on August 20, 2020, contending the order "effectively modifies the property division of the Judgment *** without jurisdiction, and by the Court's interpretation of its June 6, 2019[,] Order, renders the June 6, 2019[,] Order voidable for lack of jurisdiction."

¶ 17                                    II. ANALYSIS

¶ 18 On appeal, Joe asserts the trial court lacked jurisdiction to enter the July 22, 2020, order since it constituted an impermissible modification of the original property division contained within the Judgment entered February 13, 2018. Further, he contended throughout the proceedings the June 6, 2019, order was also entered without jurisdiction since it too sought to modify the terms of the property division. Dawn maintains the position she took before the trial court, *i.e.*, that the two previous orders entered June 6, 2019, and July 22, 2020, were both the

proper exercise of the trial court's authority to enforce the terms of its own lawful orders. Further, Dawn contends this appeal should be dismissed as untimely.

¶ 19                                    A. Jurisdiction

¶ 20         "[T]he ascertainment of its own jurisdiction is one of the two most important tasks of an appellate court panel when beginning the review of a case." *People v. Smith*, 228 Ill. 2d 95, 106, 885 N.E.2d 1053, 1059 (2008). "A timely filed notice of appeal is the only jurisdictional step required to confer jurisdiction upon the appellate court." *People v. Abdullah*, 2019 IL 123492, ¶ 21, 160 N.E.3d 833. The trial court's order was entered on July 22, 2020, and Joe's notice of appeal was filed on August 20, 2020, asking that the July 22, 2020, order be declared void for lack of jurisdiction. Under Illinois Supreme Court Rule 303(a)(1) (eff. Jul. 1, 2017), this was a timely filed notice of appeal. Dawn's request for dismissal of the appeal, claiming it to be untimely, confuses untimeliness with simply a losing argument for appellant regarding the trial court's jurisdiction to enter the July 22, 2020, order.

¶ 21         Since Joe questions the trial court's subject matter jurisdiction, our standard of review is *de novo*. *Glass v. Illinois Department of Corrections*, 2022 IL App (4th) 210740, ¶ 3. *De novo* means we perform the same analysis a trial court would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578, 948 N.E.2d 132, 146 (2011). "A circuit court's subject matter jurisdiction is conferred by our state constitution and extends to all 'justiciable matters.' " *Oliver v. Kuriakos-Ciesil*, 2020 IL App (4th) 190250, ¶ 17, 163 N.E.3d 1207 (citing *McCormick v. Robertson*, 2015 IL 118230, ¶¶ 19-20, 28 N.E.3d 795). " '[T]he question of subject matter jurisdiction is a matter of the justiciability of the class of cases to which the instant case belongs. Error or irregularity in the proceeding, while it may require reversal of the court's judgment on

appeal, does not oust subject matter jurisdiction once it is acquired.' " *Oliver*, 2020 IL App (4th) 190250, ¶ 17 (quoting *In re M.W.*, 232 Ill. 2d 408, 423, 905 N.E.2d 757, 768 (2009)).

¶ 22       Under section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), "The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State." 750 ILCS 5/510(b) (West 2018). "The provisions for disposition of property in a dissolution judgment are thus a vested right and the trial court lacks jurisdiction to modify such provisions once judgment has become final." *In re Marriage of Davis*, 292 Ill. App. 3d 802, 807, 686 N.E.2d 395, 399 (1997).

¶ 23       Here, Joe contends the trial court lacked "jurisdiction" to enter the order it did on July 22, 2020, because it was a modification of a property settlement as part of the Judgment entered in February of 2018. Joe claims support for his position lies in *Waggoner v. Waggoner*, 78 Ill. 2d 50, 398 N.E.2d 5 (1979), where the wife, through a motion for contempt, sought to modify the terms of the property settlement which otherwise made her responsible for a pre-existing lien on the marital residence she acquired in the divorce. The lien existed before the settlement agreement was entered, but she contended she was not aware of it when she agreed to take the property " 'subject to the indebtednesses.' " *Waggoner*, 78 Ill. 2d at 51. The *Waggoner* court found the wife was not trying to enforce the terms of the existing decree but instead "engraft new obligations onto the decree" by seeking to compel the husband to remove the lien and attempting to do so through a contempt proceeding. *Waggoner*, 78 Ill. 2d at 54. There were two problems with her approach: first, a modification of the property settlement was not possible at that stage of the proceedings, and second, contempt was not the appropriate vehicle with

which to seek a modification anyway. *Waggoner*, 78 Ill. 2d at 54. As a result, the trial court was found to lack subject matter jurisdiction to hear the contempt petition. *Waggoner*, 78 Ill. 2d at 54.

¶ 24 Unfortunately for Joe, the trial court's order here has no similarity to the contempt petition in *Waggoner*. Parenthetically, we note the supreme court began its jurisdictional analysis with the observation that "a court in a divorce proceeding retains jurisdiction for the purpose of enforcing its decrees." *Waggoner*, 78 Ill. 2d at 53. In fact, "a trial court has indefinite jurisdiction to enforce the terms of a [marital] judgment that included a MSA [(marital settlement agreement)]." *In re Marriage of O'Malley ex rel. Godfrey*, 2016 IL App (1st) 151118, ¶ 42, 64 N.E.3d 729.

¶ 25 B. June 6, 2019, Order

¶ 26 We outline the tortured path this litigation has taken in the past four years to illuminate the efforts made to resolve the disposition of real estate holdings including the marital residence and to explain the genesis of the orders. Joe claims the added language in the June 6, 2019, order, improperly modifying the original Judgement, was further modified by the July 22, 2020, order, thereby depriving the trial court of subject matter jurisdiction. The orders of June 6, 2019, and July 22, 2020, were the trial court's best efforts to enforce the terms of the property division originally made a part of the Judgment. The June 6, 2019, order arose out of a series of enforcement petitions filed by Dawn, focused primarily on Joe's failure to cooperate with the realtor in selling the Falcon Point residence and the Iles property and failing to pay maintenance, which Joe had also petitioned to modify. The trial court not only found Joe in contempt for the unpaid maintenance, but it also found him in contempt for failing to cooperate with the realtors concerning both the commercial real estate and the Falcon Point residence in question here.

¶ 27 In response to Joe's claim it no longer had jurisdiction, the trial court concluded:

"The court disagrees as the court retains jurisdiction to enforce the terms of the Judgment. Among those terms are that the parties were ordered to cooperate with the realtor in marketing the property for sale. Joe has not reasonably cooperated with the realtor. The provisions of the Judgment must be enforced."

¶ 28　　　　　One lens through which we can look to see whether a trial court's action constitutes an improper modification of property distribution can be found in *In re Marriage of Hall*, 404 Ill. App. 3d 160, 935 N.E.2d 522 (2010). In *Hall*, when it was later learned the trial court had entered a Qualified Domestic Relations Order (QDRO) that inadvertently omitted the husband's pension plans, the wife sought modification based on mutual mistake. The trial court denied the motion, concluding the evidence was insufficient to establish mutual mistake and the wife was required to establish the defect was the result of duress, disability, or fraud. On appeal, the Second District found it had been the intention of the parties for the wife to receive 50% of the husband's pensions and she was not required to show duress, disability, or fraud because her petition was not intended to reform the marital settlement agreement, but to enforce the agreement as intended by the parties. The *Hall* court relied on similar circumstances found in *In re Marriage of Allen*, 343 Ill. App. 3d 410, 798 N.E.2d 135 (2003), where the petitioner-wife learned the trial court entered a QDRO using the wrong formula, petitioned to amend the QDRO to reflect the formula contained in the judgment, and was successful. The respondent-husband argued on appeal the trial court did not have jurisdiction to modify the judgment. Relying on the court's "indefinite jurisdiction to enforce the judgment," the court in *Allen* concluded the petitioner was merely attempting "to enforce the petitioner's rights and obligations." *Allen*, 343 Ill. App. 3d at 412-13. Based on this, the court in *Hall* identified two criteria we can consider

when determining whether a party is seeking to modify or enforce a property division. It found the changes requested by the wife "did not impose new or different obligations on the parties," and it further found they were "necessary to enforce the petitioner's rights and obligations." (Internal quotation marks omitted.) *Hall*, 404 Ill. App. 3d at 165.

¶ 29 Here, according to the terms of the original Judgment, the parties were ordered to "reasonably cooperate with the realtor to market and competitively price the home for sale." Joe, who was permitted to reside in the home, was responsible for the payment of the mortgage, utilities, property taxes, and other reasonable expenses associated with his residence at the home. Upon sale, he was entitled to reimbursement for one-half the costs of any repairs made, as well as other reimbursements for payments made "from the date of the entry of the Judgment though [*sic*] the date of the sale." The net proceeds of the sale were then to be divided evenly between the parties. By the time of the June 6, 2019, order, the trial court had presided over numerous contested hearings between the parties on a multitude of issues and heard a substantial amount of testimony over the course of two separate hearings in February and April 2019, relating, in large part, to the continued efforts to sell the Falcon Point marital residence and the Iles property. Finding Joe to have been noncompliant in efforts to list and market the commercial property, in the June 6, 2019, order, the trial court found him in indirect civil contempt. Regarding the Falcon Point residence, the trial court reiterated the terms of the original Judgment as outlined above, noting first how, within the terms of the Judgment, the trial court "retained jurisdiction to enforce its division of marital property and debt." Joe had originally been found responsible for making any necessary home repairs prior to sale because he continued to reside in the home and was in a better position financially to do so. Unfortunately, the evidence presented at the hearings revealed, among other things, he had made several employment decisions, including forgoing

- 11 -

financial opportunities worth more than $70,000 a year, for questionable reasons, and he was no longer able to pay for the repairs. The trial court further outlined how, even though the realtor was a friend of Joe's, he was unable to secure Joe's cooperation in either getting repairs completed, authorizing photographs, or even facilitating a "virtual tour" of the home for marketing purposes. Additionally, Joe refused the realtor's repeated recommendations to reduce the price for sale.

¶ 30   It was this combination of factors which caused the trial court to conclude Joe's failure to cooperate with the realtor's recommendations to successfully market the residence required the court to fashion a proper remedy. Although Joe continually maintained the value of the home exceeded $580,000, he did so without any credible supporting data, and both the realtor and Dawn sought to have it listed at $505,000. Dawn's resolution was to suggest the trial court order Joe to buy her out at the $505,000 figure, which would then establish her equitable interest. Joe would remain entitled to credits for repairs and payments as provided in the Judgment. If he was unable to obtain financing to buy her out, her share could come from the sale of the commercial property or the house when sold. Ironically, the offer to purchase Dawn's interest at the $505,000 figure was also proposed by Joe in his written closing argument submitted simultaneously with Dawn's.

¶ 31   The trial court elected to accept this suggestion, which not only removed the need of the parties to cooperate further in the sale of the residence but left Joe free to sell it for more, obtaining the benefit if he could. The ultimate sale price of the house, or the value of Dawn's equitable interest in it, was never a fixed figure in the Judgment, and the court's decision "did not impose new or different obligations on the parties." Further, based on the ongoing problems in obtaining Joe's cooperation, it was "necessary to enforce the petitioner's rights and

obligations." (Internal quotation marks omitted.) *Hall*, 404 Ill. App. 3d at 165. The condition contained in the June 6, 2019, order requiring Joe to refinance the home to pay Dawn her equitable interest or, if unable to do so, pay it from the sale of the Iles property, was no different than the terms of the original Judgment. He was still entitled to reimbursement for the same repairs and expenses, and her equitable share remained the same, with payment coming from the sale of the Iles property instead of the sale of the residence since Joe had obstructed any effort to successfully market the Falcon Point residence. At the time of the original Judgment, it was contemplated that credit for the satisfaction of any outstanding debts, costs of repairs, or other expenses relating to the Falcon Point residence would come from either the sale of the residence or the commercial property, as evidenced by the included contingency for satisfying any outstanding debts, costs of repairs, or other expenses paid by Joe "if the Iles property is not sold." Instead, by the time of the June 6, 2019, order, it was apparent the commercial property was likely to sell before the residence, the sale of which, after the order, would fall squarely within the control of Joe alone. Whether payment came from the sale of the home or the commercial property, the adjustments and Dawn's share remained the same. Again, these were conditions and terms which were neither new nor different and were necessary to effectuate the terms of the Judgment.

¶ 32        Little discussion is needed to dispel Joe's claim the order fails to designate when credits were to be determined against Dawn's share. Under his scenario, they continue *ad infinitum* unless or until he eventually sells the house. The order of June 6, 2019, was clear; "Joe is ordered to buy out Dawn for the value of the residence of $505,000." He was then to obtain financing within 45 days to do so, minus any "*bona fide* credits he may otherwise have under the provisions of the Judgment."

¶ 33          Here, the trial court was making a determination, based on the recommendation of both parties, of what Dawn's equitable interest or "share" would be, thereby setting the date on which Joe's credits were to be calculated. The rights of the parties were fixed as of the date of the order. The trial court's order became effective June 6, 2019—the date it was entered—and Joe's credits were to be calculated as of that date. Remember, the intent of the order was to remove the need for the parties to be jointly involved in the sale of the house any further, accept the proposal from both sides to buy her out at the $505,000 figure, and allow Joe to manage any sale thereafter as he saw fit. Not only is there nothing new about these conditions, but they arose from the recommendations of both parties. For Joe to claim the court erred by crafting a resolution including a buy-out of Dawn's interest at the $505,000 figure, he ignores his own invitation to the court to consider it as a resolution of the issue. In his written arguments to the court in May 2019 he said, "If she is willing to sell it for that amount of money, Joe should have the option to purchase Dawn's interest in the property for an amount equal to what she would net from the sale of the premises at a $505,000.00 sale through the realtor." A party cannot complain of error that he invited. See *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 152, 18 N.E.3d 215. "Invited error is a form of estoppel that bars a party from complaining on appeal about 'error which that party induced the court to make or to which that party consented.' " *LifeEnergy, LLC v. Illinois Commerce Comm'n*, 2021 IL App (2d) 200411, ¶ 76 (quoting *In re Detention of Swope*, 213 Ill. 2d 210, 217, 821 N.E.2d 283, 287 (2004)). Here, there was no error, but Joe is still prohibited from complaining about the trial court's selection of a course of action he suggested.

¶ 34    For all these reasons, we find the trial court's order of June 6, 2019, was a proper exercise of the court's continuing jurisdiction to enforce its own prior judgments. See *In re Marriage of Warner*, 2020 IL App (3d) 190198, ¶ 22, 151 N.E.3d 220.

¶ 35                                C. July 22, 2020, Order

¶ 36    Joe's primary claim on appeal is that the trial court was without jurisdiction to enter its order of July 22, 2020, because it was a modification of the terms of the property division in the original Judgment, as well as a modification of the June 6, 2019, order, which he contended was improperly entered for the reasons we have discussed above. Like the June 6, 2019, order, the July 22, 2020, order was preceded by a series of petitions seeking enforcement of the previous court orders, noting Joe's continued refusal to cooperate with the realtor. In the order, the trial court expressly found discussions held by the parties during the hearing preceding the written order "were not, and shall not be, considered a change or modification of the June 6, 2019[,] ruling by the court." Once again, the court laid out the terms of the June 6, 2019, order requiring Joe to buy out Dawn's equitable interest in the Falcon Point residence at $505,000 minus any credits due Joe up to June 6, 2019, the date of the order. The court further noted the residence was to remain for sale, and it became Joe's responsibility to choose the realtor and listing price for sale. Any signature required of Dawn on the listing agreement did not prejudice her right to be bought out at the $505,000 figure agreed to by the parties.

¶ 37    Considering the sequence of events leading up to the July 22, 2020, order, it is clear from this record the trial court was not seeking to modify either the original property division contained in the Judgment or the June 6, 2019, order. Nothing about the July 22, 2020, order added new terms to the property division. The Falcon Point residence remained to be sold, the parties had agreed on a price at which Dawn's equitable interest would be calculated, and Joe

- 15 -

was still to receive the credits outlined in the Judgment up to the date of the court's June 6, 2019, order fixing the interests of the parties in the real estate.

¶ 38 Since Joe maintained throughout the proceedings the house was worth more and refused to accept the recommendations of the realtor, the trial court fashioned a remedy whereby he could hire whomever he chose as the realtor and could set the sale price. Once again, he was ordered to cooperate with the realtor, although his track record to date had not been good. The July 22, 2020, order did not impose new or different obligations on the parties. As we noted above, a modification occurs under section 510(b) of the Marriage Act (750 ILCS 5/510(b) (West 2018)) "when new obligations are engrafted onto a party under the order." *Warner*, 2020 IL App (3d) 190198, ¶ 22. In *Warner*, the roles were reversed and the wife, who was awarded the farm, was ordered to pay her husband an equitable share either by securing financing or selling the farm. *Warner*, 2020 IL App (3d) 190198, ¶ 6. Much like the case before us, after several years of contentious litigation, the trial court found the wife was " 'defending the status quo through procrastination and intransigence' " and ordered the farm sold at a price offered by a buyer located by the husband. *Warner*, 2020 IL App (3d) 190198, ¶ 16. On appeal, the wife claimed the trial court lacked subject matter jurisdiction to modify the property disposition under section 510(b). *Warner*, 2020 IL App (3d) 190198, ¶ 20. The appellate court found the trial court was simply enforcing the original judgment. *Warner*, 2020 IL App (3d) 190198, ¶ 24. The wife's obligation under the original judgment had been to sell the farm and settle the marital estate, and the court's resolution was merely enforcement of that judgment within the " 'indefinite jurisdiction' " of the trial court. *Warner*, 2020 IL App (3d) 190198, ¶ 24. The same is true here. Although the mechanics of the process were, by necessity, changed due to Joe's complete lack of cooperation, the parties continued to receive what they were awarded in the property division,

there were no new or different obligations imposed on them, and the terms ordered were "necessary to enforce the petitioner's rights and obligations." (Internal quotation marks omitted.) *Hall*, 404 Ill. App. 3d at 165.

¶ 39                                 III. CONCLUSION

¶ 40        For all these reasons, we find the trial court's July 22, 2020, order was an order enforcing, not modifying, the property division contained in the original Judgment and fell within the "indefinite jurisdiction" of the trial court. Accordingly, we affirm the judgment of the trial court.

¶ 41        Affirmed.