NOTICE

Decision filed 10/17/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 231028-U

NO. 5-23-1028

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| AMANDA ABERNATHY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-OP-1247 |
| | ) | |
| ROBERT DORMAN, | ) | Honorable |
| | ) | Ronald S. Motil, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's order of September 27, 2023, found Robert Dorman to be guilty of indirect civil contempt. Said finding was not against the manifest weight of the evidence nor an abuse of discretion. The order of September 27, 2023, is affirmed.

¶ 2   The respondent, Robert Dorman, appeals the September 27, 2023, order of the circuit court of Madison County which found him to be in indirect civil contempt of court. For the reasons that follow, we affirm the circuit court's September 27, 2023, order.

¶ 3                              I. BACKGROUND

¶ 4   This case began on October 1, 2021, when the petitioner, Amanda Abernathy, filed a verified petition for a stalking no contact order against Dorman. The same day, the circuit court denied entering an *ex parte* emergency stalking no contact order finding the allegations were insufficient. The petition was set for further hearing on a plenary basis to take place on October

1

21, 2021. On October 19, 2021, attorney Edward Moorman entered his appearance on behalf of Dorman and requested a continuance of the October 21, 2021, hearing due to Moorman's medical appointments the week of the hearing. The plenary hearing was rescheduled for December 16, 2021, at 2:30 p.m.

¶ 5    The plenary hearing was rescheduled an additional six times. On May 19, 2022, the circuit court's order granting a continuance indicated the plenary hearing was rescheduled for June 16, 2022, and there would be no further continuances.

¶ 6    On June 16, 2022, the circuit court entered a mutual injunction, which stated as follows:

"Case called for hearing on entry of Plenary Order of Protection. Rather than appear in court, the Parties agree to the entry of a Mutual Injunction in lieu of a Plenary Order of Protection. The following Mutual Injunction shall issue:

1. Neither Party shall harass, abuse, stalk, intimidate, interfere with nor exploit the other in any fashion;

2. Both Parties are ordered to stay away from the other whether in person or through writing, telephone, mail, email, text messaging, electronic social networking, through 3rd parties, or any other type of communication;

3. Neither Party may come within 150 feet of the other nor come onto their residence, place of employment or current location.

4. Neither Party may damage any property belonging to the other.

5. If either Party files a motion for violation of this Order and the Court finds that this Order has been willfully violated, the offending Party shall be found in contempt of Court and sentenced accordingly;

2

6. Either Party may seek an Order of Protection/Stalking No Contact Order should the need arise;

7. This injunctive Order will expire on June 15, 2023, or until further Order of the Court."

¶ 7    On January 17, 2023, Abernathy filed a verified motion for rule to show cause which alleged that Dorman was failing to comply with the previously entered mutual injunction. The motion for rule to show cause was set for hearing on February 23, 2023.

¶ 8    On February 21, 2023, Dorman, through counsel, filed a motion to continue the hearing alleging that the parties had been engaged in discussions and a settlement may result. The continuance was granted, and the hearing was rescheduled for March 23, 2023. On March 21, 2023, a similar motion to continue was filed and the hearing was rescheduled for April 27, 2023.

¶ 9    At some point during the proceedings, Dorman served interrogatories upon Abernathy to be answered; however, there is no certificate of service or notice of filing within the common law record regarding such interrogatories. On April 13, 2023, Abernathy, through counsel, filed a notice of filing to certify that she filed answers to interrogatories on the same day. On April 21, 2023, Dorman filed another motion for continuance and then filed an amended motion for continuance on April 25, 2023. This motion alleged that Abernathy had not yet answered discovery and that a 30-day continuance would still be needed. The motion was granted, and the hearing was rescheduled for May 11, 2023.

¶ 10    On May 10, 2023, Dorman filed another motion to continue, this time due to the hospitalization of his counsel. The motion was granted, and the hearing was rescheduled for June 15, 2023.

¶ 11 On June 15, 2023, Abernathy appeared for the scheduled hearing with counsel and witnesses. Dorman failed to appear but had emailed the circuit court advising that his counsel had been hospitalized on June 14, 2023. The circuit court entered an order the same day finding that the hearing on the motion for rule to show cause, which was filed on January 17, 2023, would be heard on July 27, 2023, and that there would be no further continuance of this matter. Additionally, the circuit court extended the mutual injunction entered on June 16, 2022, until further order of the court.

¶ 12 Dorman's counsel, the venerable Edward Moorman, died on June 28, 2023. On July 25, 2023, Dorman filed his *pro se* entry of appearance. Additionally, on the same day, Dorman filed a motion for a change of judge from the Honorable Judge Heflin, a motion to vacate injunction, and a jury demand.

¶ 13 On July 26, 2023, Judge Heflin recused herself from the matter due to Dorman's motion for substitution of judge as of right. The matter was then set for a hearing on all pending motions on September 8, 2023.

¶ 14 On August 4, 2023, Dorman filed a verified motion for adjudication of contempt. The verified motion states, *inter alia*, that "both Parties agreed to a Mutual Injunction," and Dorman alleges that Abernathy has violated the mutual injunction.

¶ 15 On August 9, 2023, due to the unavailability of the court, the hearing of September 8, 2023, was rescheduled for September 11, 2023.

¶ 16 On August 18, 2023, Dorman submitted a subpoena *duces tecum* summoning the Madison County Sheriff's Office to produce body camera footage of various incidents. The Madison County State's Attorney's Office filed a motion to quash the subpoena *duces tecum*. Dorman filed a motion to deny the motion to quash.

4

¶ 17    On September 11, 2023, the circuit court held a hearing on the pending motions. At the beginning of said hearing, Dorman, as a *pro se* litigant, made an oral motion to continue the hearing, which was denied. Next, the circuit court considered the motions on the subpoena *duces tecum* Dorman had issued. The circuit court granted the motion to quash the subpoena.

¶ 18    Then, the circuit court stated the next motion to be heard would be Abernathy's motion for rule to show cause which was filed on January 17, 2023. However, before moving onto the motion for rule to show cause, Dorman asked that his jury demand be considered. The circuit court denied Dorman's request for a jury demand on a matter involving an injunctive order.

¶ 19    Turning to Abernathy's motion for rule to show cause, each party gave a brief opening statement to the circuit court, then Abernathy was called as a witness on her own behalf. Abernathy testified that she has been living in her current home since 2015. She initially rented the property, and she purchased it in May 2019. The neighboring property is owned by Dorman.

¶ 20    Since the entry of the mutual injunction on June 16, 2022, Abernathy testified that she sees Dorman several days a week. She testified that Dorman engages in the behavior of "[c]oming and taking pictures or video of our property or us. There's been damage to the property of hitting the fence and coming onto the property. Driving the lawnmower across our front yard and back again. You know, threatening behavior. Just lots of different things." Abernathy testified that Dorman's behavior makes her feel scared and unsafe. She also testified that he has made threats against her and her family members.

¶ 21    Abernathy testified regarding an ongoing dispute with Dorman in separate litigation over the location of a privacy fence. Abernathy contends the fence is on her property; however, Dorman has a survey that says the fence encroaches on his property by one inch. Additionally, there was accidental damage to the fence caused by Dorman's son while using a zero-turn lawnmower.

5

Abernathy testified that other sections of fence needed to be repaired as a result of storm damage. She arranged for a contracting company, Mr. Handyman, to repair the fence that was damaged by Dorman's son as well as the portions damaged by a storm and fallen tree. Abernathy testified that Dorman approached the repairman aggressively and told him to get off his property. Dorman called the police who came to the scene. A week later, Mr. Handyman sent two men to perform the repair work on the fence. Abernathy testified that again Dorman was yelling and threatening the repairmen and he called 911. Abernathy testified the repairmen completed the job as quickly as possible without engaging with Dorman.

¶ 22 Abernathy testified that she and her husband have taken measures to protect themselves and limit their exposure to Dorman. She testified that nine security cameras have been installed on her property. The security camera system has cameras that cover all sides of her home and property. The system allows her to view and preserve video footage and take still photographs from the video. In additional to the security cameras, Abernathy also extended the preexisting fence to place a physical barrier between her home and Dorman's property.

¶ 23 Abernathy was shown and testified regarding exhibits[1] A-1 and A-2 that were photographs taken from the security camera system. The photographs showed signs that were placed within 10 feet of her driveway. Dorman stipulated that he placed the signs on a trailer as shown in exhibits A-1 and A-2. Abernathy testified that the placement of the signs by her driveway created a safety concern for her attempting to drive out of her driveway because it obstructed her view out and obstructed oncoming traffic's view of a vehicle leaving her driveway. Abernathy testified that, in an attempt to remedy the placement of the signs, she first contacted her attorney, then she contacted

---

[1]Abernathy's exhibits were admitted into evidence; however, the exhibits were not provided by appellant as part of the record on appeal.

the building and zoning department who directed her to the Collinsville Township Highway District. The highway district instructed Dorman to remove the signs from its easement.

¶ 24 Abernathy identified exhibit B-2 as a photograph taken the day following the photographs of A-1 and A-2 showing the trailer with the signs on it had been moved closer to the road and onto parts of the sidewalk. She testified that she reviewed her security camera footage that showed Dorman moving the trailer shortly after midnight.

¶ 25 Abernathy testified that in June she arranged for and paid for an extra trash pickup, but Dorman moved her trashcans from the curb back onto her property, so the trash was not removed.

¶ 26 Abernathy identified exhibits D-1 and D-2 which were photographs from the security camera footage taken on June 29, 2022, showing Dorman on her property on her side of the fence outside her son's bedroom window at 9 p.m. Abernathy testified that Dorman was playing music, he had the light on that was located on his lawnmower, and he was tearing down political signs from his trailer, and generally being loud and disruptive. She testified that this behavior did wake her son up who had been sleeping.

¶ 27 Abernathy identified exhibit E-2 as a photograph from security camera footage taken on August 25, 2022, which showed Dorman on her property on a lawnmower. She testified that Dorman drove his lawnmower across the sidewalk, across her front yard to the end of her property, where he stopped and took photographs of her property, and then drove through her yard again to return to his property.

¶ 28 Abernathy identified exhibits F-1 through F-6 as photographs from the security camera footage taken on September 18, 2022. She testified that Dorman was located at the end of her driveway, but on the sidewalk, without a shirt, socks, or shoes, and he was pacing back and forth

7

across her driveway. She was in her vehicle attempting to leave. She testified that he was at the end of her driveway on his phone for one to two minutes.

¶ 29    Abernathy testified regarding several other exhibits all showing similar photographs of Dorman coming within 150 feet of her and/or her home. She testified that she feels fearful, stressed, and tired from these interactions with Dorman. Abernathy requested the court enter a stalking no contact order for a period of two years.

¶ 30    Dorman, as a *pro se* litigant, conducted his cross-examination of Abernathy. Dorman asked Abernathy to state when and how he yelled and harassed her children. Abernathy testified that Dorman yelled at her youngest son when he and other neighborhood children were playing and accidentally crossed onto his property.

¶ 31    Dorman quesioned Abernathy about a drone. Then he asked her about a broken windshield. Next, Dorman asked Abernathy how she asked him to please stop several times. She testified that they spoke in person and on the phone. A recess in the hearing was taken as court adjourned for the day.

¶ 32    The hearing resumed the following day. The report of proceedings indicated that the hearing began at 8:30 a.m. and Dorman continued his *pro se* cross-examination of Abernathy. First Dorman inquired why Mr. Handyman needed to go to the property two times to repair the fence. Abernathy testified that after the first time they came to her property and Dorman called the police, she had to provide them a form stating she would pay for any legal expenses if necessary. They returned a second time after the form was provided to them. She testified they came out to repair the section of fence that was damaged by Dorman's son and the section damaged by the storm. She testified she hired a professional company to repair the fence in an attempt to prevent

animosity from Dorman. Dorman inquired if she did not repair the fence herself because she knew she would be trespassing. Next, Dorman was inquiring about the trashcan that was moved.

¶ 33    Then, at 8:37 a.m., attorney Thomas Maag entered the courtroom. He stated he had entered his appearance in the case. The common law record reflects that on September 12, 2023, at 7:57 a.m. Maag filed a notice of limited scope appearance which indicated that he was appearing in the court proceeding for the motion for adjudication of contempt and related pending on September 12, 2023.

¶ 34    Abernathy objected to Maag taking over the cross-examination; however, the objection was overruled. Maag then proceeded with the cross-examination of Abernathy. Abernathy again testified regarding the political signs restricting her view of traffic. Abernathy was questioned regarding her understanding of what an easement was and who owned the property where the signs were placed. Abernathy testified that she believed that political signs could not obstruct the view of traffic. She did not call the police regarding the placement of political signs.

¶ 35    Abernathy testified that she did call the police three times after the mutual injunction was entered. She called the police when Dorman's son hit the fence while driving the zero-turn lawnmower. She called the police again when Dorman drove the lawnmower across her yard, and again when Dorman was cutting grass and came onto her property regarding the markings for work to be performed. Abernathy was questioned regarding the same incidents she had testified to the previous day.

¶ 36    Additionally, Abernathy testified that on July 4, 2022, Dorman threatened her. She testified that he said, "I will kill; You're dead, bitch."

¶ 37    The next witness to testify was John Schmitt. Schmitt testified that he knew Abernathy from working together. He testified that on July 4, 2022, he was traveling to Abernathy's home to

9

take her some papers for a work issue. He testified, "[A]s I was approaching her address, because it's hard up and down the hills to see her house, I was travelling slowly when Mr. Dorman did a U-turn—or attempted to do a U-turn there on Keebler Road, was unable to do it, so he backed up, went forward, backed up again, and pulled into the property adjacent to [Abernathy's]." He testified that Dorman was driving a maroon convertible. Schmitt testified that his window was down, so he heard Dorman yelling at Abernathy. Schmitt testified that he heard Dorman state "I'll kill you." He testified that Dorman also said something in the nature of "You're dead, bitch; I can't wait to not see your face again."

¶ 38    On cross-examination, Schmitt testified that he was Abernathy's friend and that he wanted to protect her. He was asked if he would perjure himself. Schmitt testified that he would not. At the conclusion of Schmitt's testimony, Abernathy closed her case.

¶ 39    Following the close of Abernathy's case, Dorman, through counsel, made an oral motion for judgment as a matter of law. During his argument on the motion for judgment as a matter of law, Dorman alleged that the hearing was on a motion for criminal contempt and thus was entitled to constitutional protections. The motion for judgment as a matter of law was denied.

¶ 40    Next, Gary Eads was called as a witness on behalf of Dorman. Eads testified that he is Dorman's brother-in-law. He testified that he was generally familiar with what the case was about and that he was familiar with the property involved because it had formerly been his father-in-law and mother-in-law's house. Eads testified that he has flown a drone at the property with Dorman. He testified that when he tried to operate the drone it crashed in the Dorman yard and that he did not see Abernathy anywhere when this occurred.

¶ 41    On cross-examination, Eads testified that he attempted to fly a drone with Dorman one time. He did not have any knowledge of whether Dorman flew a drone when Eads was not present.

10

¶ 42   Next, Dorman testified on his own behalf. Dorman testified that he was a precinct committeeman and placed political signs "all over the place." He testified that he did not place the political signs on the trailer to harass or interfere with Abernathy. Dorman testified that on June 29, 2022, he was taking down the political signs because it was the day after the election. He testified that he might have ridden on his lawnmower, but that if he did it was not to harass anyone.

¶ 43   Dorman denied threatening Abernathy on July 4, 2022. He testified that he would have been at his residence, which is approximately three-fourths of a mile away from Abernathy's residence.

¶ 44   Dorman testified that he did drive his lawnmower on the sidewalk across Abernathy's yard on August 25, 2022. He testified that he did so in order to speak with another neighbor.

¶ 45   Dorman testified that on September 18, 2022, he did examine the flags placed by the utility company, but stated he remained on his property or the sidewalk to do so. He testified that he walked down the sidewalk wearing shorts and while talking on the phone as he was looking for other flags. He denied preventing Abernathy from leaving her driveway.

¶ 46   On cross-examination, Dorman testified that he goes to the property he co-owns with his sister that is contiguous to Abernathy's property daily. He testified that he mows the property when it needs it, which is typically once a week.

¶ 47   Dorman testified that the mutual injunction that was entered was different than what he thought would be entered. He believed additional paragraphs were to be included in the mutual injunction.

¶ 48   The next witness to testify was Catherine Demers. Demers testified that she is an attorney in Edwardsville, Illinois. Demers testified that she spent most of the day of July 4, 2022, at

11

Dorman's home for a barbecue. She testified that she was at Dorman's home from approximately 11:30 a.m. until 9 or 10 p.m., and that Dorman was at his home the entire time she was there.

¶ 49    Patricia Eads was the next witness to testify. She testified that she is Dorman's sister. She and Dorman own the property that is contiguous with Abernathy's property. She testified there is an ongoing dispute regarding the fence located between the two properties. She testified that she filed the lawsuit against Abernathy to prevent losing the property and that Dorman asked her not to file it.

¶ 50    Dorman renewed his oral motion for judgment as a matter of law, which was denied. The parties stipulated that due to the overlapping nature of the testimony and the competing motions for contempt, the court could consider all the testimony for both motions, and some additional testimony was elicited on Dorman's motion.

¶ 51    Abernathy was recalled for cross-examination. She testified that she communicated with the Collinsville Township Highway Department by phone call or text message three times between June 21, 2022, through June 23, 2022. She testified she contacted them because signs were obstructing the view of the road.

¶ 52    Abernathy testified that she has contacted the Madison County Zoning Code Enforcement office after she received notice of being in violation of codes. She denied calling to report a recreational vehicle parked on the Dorman property.

¶ 53    Abernathy testified that she has had a partial survey of her property completed, but did not recall when that occurred. The survey was for the other side of her property and not the side that was contiguous to the Dorman property.

¶ 54    Abernathy was asked duplicative questions regarding the same incidents and issues that had been testified to *ad nauseam*. Her testimony was substantially similar to her earlier testimony.

12

¶ 55    Dorman was also recalled to testify on his own behalf. He testified regarding the repair of the fence by Mr. Handyman. He testified the repairmen were on his property.

¶ 56    Abernathy was called again to testify on her own behalf. She testified she hired the repairmen to fix the fence that had been on the property since 2013. She did not instruct the repairmen to walk onto Dorman's property to take a photograph of their finished work. This completed the testimony.

¶ 57    The circuit court then ruled by oral pronouncement. The circuit court ruled, *inter alia*, as follows:

"First of all, with regard to the verified motion for adjudication of contempt by the defendant Robert Dorman against Amanda Abernathy, that motion for adjudication of contempt will be denied. And on the basis of that, in reviewing the motion, the specifics with regard to when, who called the Collinsville Highway Township Department over placement of signs, whether or not—I think the petitioner Miss Abernathy did admit that she called the Madison County Zoning Code enforcement, had a survey conducted. There's been other filings in the court.

As a judge I believe that is the way that things ought to occur, that if there's a problem, you call the authorities and you don't take matters into your own hands. And in that regard, when she did call those places, I do not believe that that was in violation of the mutual injunction that had been filed on June 16th, 2022. ***

* * *

So, I don't think that Miss Abernathy calling Handyman to do the work property and then walking onto the three to five feet of Mr. Dorman's property is really a violation of that injunctive order. ***

13

So, therefore, as I stated previously, my ruling is that Mr. Dorman's motion is denied.

Then taking up the motion for rule to show cause filed by Amanda Abernathy against Robert Dorman, Mr. Dorman, I am going to hold you in contempt of court for a violation of that injunctive order.

And—let me get to my notes here—it is my ruling and my opinion that based upon the preponderance of the evidence, the totality of the circumstances, and the evidence provided through the testimony, through the exhibits, though the argument, that Mr. Dorman is guilty of violating the mutual injunction and that he is held in contempt of court.

* * *

Now, there's been a lot of testimony with regard to whether or not the political signs were pulled. *** It's not in my opinion the political sign that is really at issue. It's where the political sign was placed.

***

And I am struck by the fact that the sign, the signs were placed in a manner that violates the order of June 16th, 2022, because part of that mutual injunction is that it prohibits the parties from any type of communication near their property.

So, my point about that is is [*sic*] that when a complaint was made about the placement of the sign, it wasn't on the larger part of the property. It wasn't so much that it was placed in a manner where people passing could see a political sign—you would want them to see it, I agree with that—but it was placed right on the property line.

14

And then when a complaint was made, I think the exhibits do show the fact that not only was the sign moved, but the sign was moved closer to the street that would obstruct her view.

\*\*\*

Had Mr. Dorman placed that sign 200 feet away from her property or from her house where she lives, there wouldn't—that wouldn't be an issue, but he placed it right on the property line and I think for improper purposes, and I think it violated the injunction.

As I stated earlier, I think the petitioner[ ] [Abernathy's] actions have been reasonable in this matter. The actions of the respondent Mr. Dorman have been highly unreasonable. And I believe that hearing the testimony, that the petitioner has been credible in this case and the respondent has not been credible in this case.

And as the weighing of the preponderance of the evidence, more weight I'm giving to the testimony, the exhibits, and the evidence offered by the petitioner in this matter. So, I believe there is sufficient cause, Mr. Dorman, to hold you in contempt of court.

In reviewing the motion for rule to show cause, I believe that there has been adequate and proper testimony and exhibits and evidence to support the fact that the respondent did violate the injunction by paragraph two on June 22nd, 2022, on June 23rd, 2022, \*\*\* on June 29th, 2022, with respect to the lawnmower and the side of the fence.

\*\*\*

I am not giving any weight to paragraph five about the, on July 4th, the high rate of speed, about slamming on his brakes. I don't think the evidence supports that. But, I do believe that Mr. Dorman violated paragraph six, paragraph seven, paragraph eight on the dates of August 25th, 2022, September 18th, 2022, and on September 18th of 2022.

15

So, I believe, as I stated, there is sufficient evidence to hold Mr. Dorman in contempt, and this is the ruling of this Court.

So, I have counted by the parts of the motion that there were six separate violations of that injunctive order, the mutual injunction, and based upon that I am going to assess a $500 assessment against Mr. Dorman for each of those six. So, that will be an assessment of $3000 for the contempt.

I would also entertain that Mr. Dorman has to pay the attorney's fees and costs of the petitioner.

It will be my ruling that I'm going to extend the injunctive order by another—by a two-year period of time, and either party will have the continued right to file a new petition for a stalking no contact order."

¶ 58 On September 27, 2023, a nine-page written order was entered that memorialized the circuit court's oral pronouncement. In addition to the oral pronouncement, the September 27, 2023, order found, *inter alia*, as follows:

"32. As stated above, the Court Finds that Respondent violated the terms of the Court Ordered Mutual Injunction on at least six occasions since June 16, 2022 and did so intentionally and contumaciously. As such, Respondent is Assessed and Fined the amount of Five Hundred Dollars ($500.00) per violation for a total Fine and Assessment of Three Thousand Dollars ($3000.00). Payment of the amount of Three Thousand Dollars ($3000.00) to the Clerk of Court is stayed and reserved to coerce the Respondent to adhere to and comply with the terms of the Mutual Injunction, dated June 16, 2022. Failure to comply with the Mutual Injunction will result in lifting the stay. The Mutual Injunction is

16

hereby extended for two years from the date of the hearing to September 12, 2025. This Court Finds that the extension of the Mutual Injunction is necessary for the safety and protection of the Parties.

33. Further, Respondent is Ordered to pay Petitioner's attorney's fees and costs associated with the pursuit and representation of the Petitioner for her Motion for Rule to Show Cause and the events surrounding Respondent's multiple violations of the Mutual Injunction. Petitioner's counsel has submitted an Affidavit substantiating the dates, description of legal services, costs, and time representing the Petitioner regarding the Respondent's violations of the Mutual Injunction. Accordingly, Respondent is Ordered to pay Petitioner's attorney's fees and costs in the amount of Eleven Thousand Eight Hundred Ninety-two Dollars ($11,892.00) directly to Petitioner's counsel within forty-five (45) days from the entry of this Order.

34. As this Court Finds that Respondent is in Indirect Civil Contempt of Court, and as such, he holds the key to purging himself of the Contempt by complying with the terms of the Mutual Injunction and by paying the Petitioner's Attorney's Fees and Costs."

¶ 59    On October 25, 2023, Dorman filed a motion to stay the circuit court's order of September 27, 2023. Additionally, on the same date, Dorman filed a notice of appeal.

¶ 60    Additional facts will be presented as necessary through the remainder of this order.

¶ 61                                II. ANALYSIS

¶ 62    On appeal, Dorman contends that he was actually found to be in indirect criminal contempt rather than indirect civil contempt as stated by the court. Based on his contention that he was found to be in indirect criminal contempt, Dorman alleges that the contempt finding should be vacated because he was denied a jury trial and that the wrong burden of proof was used. Additionally,

17

Dorman argues that since the contempt finding must be vacated that the award of attorney fees must also be vacated.

¶ 63    "Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court will not disturb the finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *In re Marriage of Admire*, 193 Ill. App. 3d 324, 329 (1989) (citing *In re Marriage of Logston*, 103 Ill. 2d 266, 287 (1984)). A court abuses its discretion only when no reasonable person would take the view adopted by the court. *In re Marriage of O'Malley*, 2016 Il App (1st) 151118, ¶ 25.

¶ 64    There are four types of contempt: direct criminal contempt, direct civil contempt, indirect criminal contempt, and indirect civil contempt. *In re Parentage of A.C.*, 2024 IL App (1st) 232052, ¶ 18. The type of contempt case determines the procedures that must be followed. *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 13.

¶ 65    Direct contempt versus indirect contempt is "distinguished based upon *where* the contemptuous conduct occurred." (Emphasis in original.) *Windy City Limousine Co. v. Milazzo*, 2018 IL App (1st) 162827, ¶ 40. When the alleged contemptuous conduct occurs in the presence of a judge, it is direct contempt. *Id.* If the contemptuous conduct occurs outside the presence of a judge, it is indirect contempt. *Id.*

¶ 66    "Criminal contempt is 'instituted to punish, as opposed to coerce, *** for past contumacious conduct.' " *In re Parentage of A.C.*, 2024 IL App (1st) 232052, ¶ 19 (quoting *O'Malley*, 2016 IL App (1st) 151118, ¶ 27). "Civil contempt is 'designed to compel future compliance with a court order' and can be avoided through compliance alone." *Id.* ¶ 18 (quoting *O'Malley*, 2016 IL App (1st) 151118, ¶ 26). In a civil contempt proceeding, the court may impose

18

a coercive sanction of a fine or imprisonment. *Harper v. Missouri Pacific R.R. Co.*, 282 Ill. App. 3d 19, 30 (1996).

¶ 67    "The classification of contempt as either civil or criminal is essentially a function of the purpose for which the contempt sanctions are imposed." *Dart*, 2012 IL App (1st) 103504, ¶ 15. To determine if a finding of contempt was civil or criminal, "we must examine the nature of the sanctions imposed." *Id.* ¶ 14. "[T]he test is whether, considering the totality of the circumstances, the contempt proceeding is coercive or punitive in nature." *Id.* ¶ 15.

¶ 68    On appeal, Dorman argues that he was found to be in indirect criminal contempt. He first argues that the hearing was actually handled as a criminal contempt case because the circuit court used the term "guilty" when making its finding that Dorman should be found in contempt for his violation of a court order. Without any citation to authority, Dorman argues that " '[g]uilty' is clearly a term associated with criminal matters, not civil." Contrarily, Black's Law Dictionary defines guilty as: "1. Having committed a crime; responsible for a crime. 2. Responsible for a civil wrong, such as a tort or breach of contract." Black's Law Dictionary (12th ed. 2024).

¶ 69    Next, Dorman argues that the fine of $3000 was a punishment, because the reasons for the implication of the fine cannot now be undone. The circuit court's order imposed fines of $500 each for six different violations of the court order, for a total of $3000. Furthermore, the order stated, "Payment of the amount of Three Thousand Dollars ($3000) to the Clerk of Court is stayed and reserved to *coerce* the Respondent [Dorman] to adhere to and comply with the terms of the Mutual Injunction, dated June 16, 2022. Failure to comply with the Mutual Injunction will result in lifting the stay." (Emphasis added.) The circuit court made findings of fact that Dorman repeatedly violated the mutual injunction and imposed a fine to coerce future compliance with the order. Dorman may purge himself of the contempt by simply following the mutual injunction, and then

19

no payment of the fine is necessary. Based on the totality of the circumstances, the finding of contempt in this matter was a finding of indirect civil contempt. Further, we find it was not against the manifest weight of the evidence nor an abuse of discretion to find Dorman in indirect civil contempt in this matter.

¶ 70    Dorman's next two contentions on appeal, that he had a right to a jury trial for the contempt proceedings and that the wrong burden of proof was applied, both stem from his assertion that he was found guilty of indirect criminal contempt. As we have determined that the circuit court conducted a hearing and found Dorman to be in indirect civil contempt, we need not address these issues.

¶ 71    Dorman acknowledges the circuit court has inherent power to require a contemptuous party to bear attorney fees. However, Dorman argues that the attorney fees should not have been awarded as there was no proper finding of contempt and thus the attorney fee award was void. He makes no other argument against the attorney fees award in this case. As set forth above, the circuit court made a finding of indirect civil contempt that was supported by the evidence. "The court may require a contemptuous party to bear the contempt action's reasonable costs and attorney fees. [Citation.] The court's power in this regard is incidental to its inherent contempt powers and may be exercised upon a finding of contempt." *Edwards v. Pekin Memorial Hospital*, 2023 IL App (3d) 210005, ¶ 49. As such, the circuit court's attorney fees award was proper.

¶ 72                                III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the circuit court's order of September 27, 2023.


¶ 74    Affirmed.